# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DREW DOZIER, derivatively on behalf of LANNETT COMPANY, INC., | |
| Plaintiff, | **C.A. No.** _____ |
| vs. | |
| ARTHUR P. BEDROSIAN, TIMOTHY C. CREW, MARTIN P. GALVAN, JOHN KOZLOWSKI, DAVID DRABIK, JEFFREY FARBER, PATRICK LEPORE, JAMES M. MAHER, ALBERT PAONESSA, III, and PAUL TAVEIRA | **DEMAND FOR JURY TRIAL** |
| Defendants, | |
| and | |
| LANNETT COMPANY, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## INTRODUCTION

Plaintiff Drew Dozier ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of Nominal Defendant Lannett Company, Inc. ("Lannett" or the "Company"), files this Verified Shareholder Derivative Complaint against Individual Defendants Arthur P. Bedrosian, Timothy C. Crew, Martin P. Galvan, John Kozlowski, David Drabik, Jeffrey Farber, Patrick

Lepore, James M. Maher, Albert Paonessa, III, and Paul Taveira (collectively, the "Individual Defendants," and together with Lannett, the "Defendants") for breaches of their fiduciary duties as directors and/or officers of Lannett, unjust enrichment, waste of corporate assets, and violation of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls, and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Lannett, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## <u>NATURE OF THE ACTION</u>

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by Lannett's directors and officers from at least July 15, 2014 to October 31, 2017 (the "First Relevant Period") and February 8, 2018 through the present (the "Second Relevant Period").

2.      Lannett specializes in the development, manufacture, marketing, and distribution of generically branded pharmaceuticals products. The Company touts itself as having a "reputation for regulatory compliance." The Company also works with generic pharmaceutical manufacturers for certain drug products.

3.      Up until around March 2019, Lannett's main supplier of several of its key generic drug products was Jerome Stevens Pharmaceuticals, Inc. ("JSP") through a distribution agreement

negotiated by Lannett's former CEO, Arthur P. Bedrosian ("Defendant Bedrosian") in 2004 in which JSP would manufacture certain drug tablets that Lannett would then distribute to the market (the "Distribution Agreement"). The Distribution Agreement greatly favored the Company; JSP supplied Levothyroxine Sodium Tablets USP ("Levothyroxine"), one of the Company's most successful drugs. In fiscal years 2018, 2017, and 2016, Levothyroxine's net sales amounted to $253.1 million, $187.0 million, and $190.4 million, respectively. In addition, JSP also supplied another key product of the Company, Digoxin Tablets ("Digoxin"), net sales of which totaled $4.9 million and $9.5 million during the fiscal years 2018 and 2017, respectively. Together, these two products represented 37% and 29% of the Company's total net sales for the fiscal years 2016 and 2017, respectively. On August 19, 2013, JSP and Lannett agreed to amend the Distribution Agreement and extend the initial contract for a five-year term until at least March 23, 2019.

4.      Although generic drug products have been known to be cheaper than their brand-name bioequivalents, around 2013, the generic drug industry experienced a significant price-spike. In response, the Department of Justice (the "DOJ"), Congress, and numerous state attorneys general began probing into various generic drug companies to uncover the explanation behind the rapid price increases.

5.      The state and federal regulatory investigations revealed an industry-wide scheme involving a number of generic drug companies, including Lannett, who colluded in order to fix prices and engage in other anticompetitive behavior, including market division schemes to split the market between generic drug company participants to effectuate and maintain inflated pricing for at least 18 generic drugs (the Anti-Competitive Misconduct").

6.      As a result of the Anti-Competitive Misconduct, during the First Relevant Period, Lannett's financial sales were bolstered by the price-fixing of at least five of its generic drugs,

Doxycycline Monohydrate ("Doxy Mono"), Digoxin, Levothyroxine, Acetazolamide, and Ursodiol. In fact, Doxy Mono and Acetazolamide were two named products in the action brought on behalf of the State Attorneys General of over 40 states, the District of Columbia, and the Commonwealth of Puerto Rico against Lannett, among others, in the United States District Court for the Eastern District of Pennsylvania, captioned *State of Connecticut et al v. Aurobindo Pharma USA, Inc. et al.*, Case No. 2:17-cv-03768 (E.D. Pa.) (the "AG Action"), and the remainder of the five drugs were named in hundreds of antitrust lawsuits consolidated in Multidistrict Litigation concerning the Anti-Competitive Misconduct against Lannett, among others, in the United States District Court for the Eastern District of Pennsylvania, captioned *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, Case No. 16-md-2724, MDL No. 2724 ( E.D. Pa.) ("Antitrust Action"). However, the Individual Defendants throughout the First Relevant Period repeatedly assured investors and the public through press releases, conference calls, and SEC filings that the Company was not engaged in the Anti-Competitive Misconduct, nor would the Company be implicated or impacted by the enforcement actions responding to the Anti-Competitive Misconduct. The Individual Defendants maintained these assurances in spite of receiving subpoenas related to ongoing state and federal investigations related to the Anti-Competitive Misconduct from at least July 2014.

7.      On September 25, 2017, the Company announced that Defendant Bedrosian would be departing from the Company, effective December 31, 2017.

8.      On October 31, 2017, Lannett was named in an amended complaint filed in the AG action. The amended complaint was filed after further examination into the price-fixing and anti-competitive scheme, which the Connecticut Attorney General began investigating prior to 2016.

9.      On this news, the price per share of Lannett stock fell over the course of the trading session by $3.25 or 14% from an opening price of $23.15 per share on October 31, 2017, to close at $19.90 the same day.

10.     In January 2018, the Company announced its new CEO, Timothy C. Crew ("Defendant Crew"). After over a decade of benefiting from the Distribution Agreement between Lannett and JSP, Defendant Bedrosian's parting with the Company presented a risk to the business arrangement with JSP, which had initially been negotiated and maintained through the efforts of Defendant Bedrosian himself.

11.     On February 8, 2018, the Company announced in a Form 8-K filed with the SEC that despite his departure from the Company, Defendant Bedrosian would remain involved with Lannett in a "strategic advisory role. . ." These reassurances were not effective to quell the fragility of Lannett's relationship with JSP in light of the changing leadership structure that was ongoing within the Company in connection with its new CEO. Still, the Individual Defendants failed to appropriately address the impending risk posed to the Distribution Agreement and instead made representations to the public and investors through conference calls and SEC filings that JSP had a vested interest in Lannett and that the Company's relationship with JSP would endure.

12.     On August 20, 2018, prior to the market opening, the Company issued a press release announcing that the Distribution Agreement would not be renewed.

13.     On this news, the price per share of Lannett stock fell from the previous trading session by $8.15 or 60% from a closing price of $13.50 per share on August 17, 2018, to close at $5.35 on August 20, 2018.

14.     During the First Relevant Period, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to participate in the Anti-

Competitive Misconduct and not subsequently ceasing all business relations with Defendant Bedrosian.

15.     The Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and compliance. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia,* that: (1) Lannett was a participant in the Anti-Competitive Misconduct; (2) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (3) the Company lacked internal controls over the its pricing procedures for at least five of its drug products; (4) Lannett was at risk for regulatory investigation and enforcement that would negatively impact the Company; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements in the First Relevant Period were materially false and misleading.

16.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public while at least five of them engaged in insider sales, netting proceeds of over $6.6 million.

17.     During the Second Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company make false and misleading statements to the investing public that

failed to disclose, *inter alia*, that: (1) JSP did not have a vested interest in the Company; (2) the Distribution Agreement and relationship with JSP would not likely continue; and (3) the company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements during the Second Relevant Period were materially false and misleading.

18.     The Individual Defendants also breached their fiduciary duties by failing to correct and causing the Company to fail to correct these false and misleading statements and omissions of material fact to the investing public.

19.     During the First Relevant Period and the Second Relevant Period, the Individual Defendants also breached their fiduciary duties by causing the Company to fail to maintain internal controls.

20.     In light of the Individual Defendants' misconduct, which has subjected Lannett, its former President and Chief Executive Officer ("CEO"), and its Chief Financial Officer ("CFO") to being named as defendants in a federal securities fraud class action lawsuit filed in the United States District Court for the Eastern District of Pennsylvania (the "First Class Action"), and the Company, its current CEO, and CFO, to being named defendants in a federal securities fraud class action lawsuit pending in the United States District Court for the Eastern District of Pennsylvania (the "Second Class Action," and together with the First Class Action, the "Securities Class Actions"), which survived a motion to dismiss, to numerous lawsuits, including the Antitrust Action, the AG Action, and regulatory investigations lodged against the Company resulting from Anti-Competitive Misconduct, the need to undertake internal investigations, the need to implement adequate internal controls over its pricing procedures and financial reporting, the losses from the waste of corporate assets, the losses due to the unjust enrichment of the Individual Defendants who

were improperly over-compensated by the Company and/or who benefitted from the wrongdoing alleged herein, the Company will have to expend many millions of dollars.

21.     In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, their collective engagement in fraud, the substantial likelihood of the directors' liability in this derivative action, the current CEO's liability in the Second Class Action, the former CEO's liability in the First Class Action, and the CFO's liability in the Securities Class Actions, their being beholden to each other, their longstanding business and personal relationships with each other, and their not being disinterested or independent directors, a majority of Lannett's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

22.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1) and Rule 14a-9 of the Exchange Act, 17 C.F.R. § 240.14a-9.

23.     Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Actions based on violations of the Exchange Act.

24.     This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

25.     This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

26.     The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation incorporated in this District, or he or she is an individual who has minimum contacts with this District to justify the exercise of jurisdiction over them.

27.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Defendants have received substantial compensation in this District by engaging in numerous activities that had an effect in this District.

28.     Venue is proper in this District because Lannett and the Individual Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

29.     Plaintiff is a current shareholder of Lannett common stock and has continuously held Lannett common stock at all relevant times.

### Nominal Defendant Lannett

30.     Lannett is a Delaware corporation with its principal executive offices at 9000 State Road, Philadelphia, Pennsylvania 19136. Lannett's shares trade on the NYSE under the ticker symbol "LCI."

### Defendant Bedrosian

31.     Defendant Bedrosian served as the Company's President from May 2002 until December 2014 and as the Company's CEO from January 2006 until his departure from the Company in January 2018. Defendant Bedrosian also served as the Company's Vice President of Business Development in January 2002 until April 2002 and served as a Company director from February 2000 to January 2002. He was reelected as a director in January 2006 and served as a Company director until his departure on December 31, 2017. According to the Company's

Schedule 14A filed with the SEC on December 7, 2017 (the "2017 Proxy Statement"), as of October 31, 2017, Defendant Bedrosian beneficially owned 31,552 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2017 was $19.90, Defendant Bedrosian owned approximately $627,884 worth of Lannett stock.

32.     Although Defendant Bedrosian departed from the Company effective December 31, 2017, according to the Company's Schedule 14A filed with the SEC on December 10, 2018 (the "2018 Proxy Statement"), for the fiscal year ended June 30, 2018, Defendant Bedrosian received $3,617,957 in compensation from the Company. This included $381,635 in salary, $551,249 in restricted stock awards, $34,999 in option awards, and $2,650,074 in all other compensation.

33.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Bedrosian made the following sales of company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| July 15, 2014 | 5,000 | $  47.19 | $   235,950 |
| August 18, 2014 | 5,000 | $  41.30 | $   206,500 |
| September 16, 2014 | 5,000 | $  40.05 | $   200,250 |
| October 15, 2014 | 5,000 | $  40.22 | $   201,100 |
| November 17, 2014 | 5,000 | $  47.70 | $   238,500 |
| December 15, 2014 | 5,000 | $  43.81 | $   219,050 |
| January 15, 2015 | 5,000 | $  43.50 | $   217,500 |
| February 17, 2015 | 5,000 | $  59.89 | $   299,450 |
| April 15, 2015 | 5,000 | $  69.43 | $   347,150 |
| May15, 2015 | 5,000 | $  53.27 | $   266,350 |

| June 15, 2015 | 5,000 | $  56.31 | $   281,550 |
| July 15, 2015 | 5,000 | $  61.92 | $   309,600 |
| August 17, 2015 | 5,000 | $  52.81 | $   264,050 |
| September 15, 2015 | 5,000 | $  55.64 | $   278,200 |

Thus, in total, before the fraud was expose, he sold 70,000 Company shares on inside information, for which he received approximately 3.5 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

34.     The Company's 2017 Proxy Statement stated the following about Defendant Bedrosian:

> **Arthur P. Bedrosian, J.D.,**[1] was promoted to President of the Company in May 2002 and CEO in January of 2006.  Previously, he served as the Company's Vice President of Business Development from January 2002 to April 2002.  Mr. Bedrosian was elected as a Director in February 2000 and served to January 2002.   Mr. Bedrosian was re-elected a Director in January 2006.  Mr. Bedrosian has operated generic drug manufacturing, sales and marketing businesses in the healthcare industry for many years.  Prior to joining the Company, from 1999 to 2001, Mr. Bedrosian served as President and Chief Executive Officer of Trinity Laboratories, Inc., a medical device and drug manufacturer.  Mr. Bedrosian also operated Pharmaceutical Ventures Ltd, a healthcare consultancy, Pharmeral, Inc. a drug representation company selling generic drugs and Interal Corporation, a computer consultancy to Fortune 100 companies. Mr. Bedrosian holds a Bachelor of Arts Degree in Political Science from Queens College of the City University of New York and a Juris Doctorate from Newport University in California.

**Defendant Crew**

35.     Defendant Crew has served as Lannett's CEO and as a Company director since January 2018. According to the 2018 Proxy Statement, as of October 31, 2018, Defendant Crew beneficially owned 39,988 shares of the Company's common stock. Given that the price per share

---

[1] Emphasis in original unless otherwise noted in this Complaint.

of the Company's common stock at the close of trading on October 31, 2018 was $3.66, Defendant

Crew owned approximately $146,356 worth of Lannett stock.

36.     For the fiscal year ended June 30, 2018, Defendant Crew received $1,329,781 in

compensation from the Company. This included $350,539 in salary, $400,016 in restricted stock

awards, $126,252 in option awards, and $52,971 in all other compensation.

37.     The Company's 2018 Proxy Statement stated the following about Defendant Crew:

**Timothy C. Crew** was appointed as the Company's Chief Executive Officer and a
Director of the Company in January 2018.  Mr. Crew has more than 25 years of
experience in the generic and branded pharmaceutical industries.  Previously, he
served as Chief Executive Officer of Cipla North America, a global pharmaceutical
company based in Mumbai, India.  Before Cipla, he worked for eight years at Teva
Pharmaceuticals Industries Ltd. ("Teva"), where he ultimately served as Senior
Vice President and Commercial Operating Officer of the North American Generics
division, the world's largest generic operation with multibillion dollars of annual
sales.  Before that, he was Teva's Vice President, Alliances and Business
Development.  Mr. Crew was also an Executive Vice President, North America, for
Dr. Reddy's Laboratories Ltd.  Mr. Crew began his pharmaceutical career at
Bristol-Myers Squibb, where he held a number of senior management positions in
global marketing, managed healthcare, marketing, business development and
strategic planning.  Prior to his pharmaceutical roles, Mr. Crew served in the United
States Army, where he rose to the rank of Captain. Mr. Crew earned a Bachelor of
Arts degree in economics from Pomona College and a Master of Business
Administration degree from Columbia Business School.

**Defendant Galvan**

38.     Defendant Martin P. Galvan ("Galvan") has served as the Company's Vice

President of Finance and CFO since August 2011. According to the 2018 Proxy Statement, as of

October 31, 2018, Defendant Galvan beneficially owned 51,238 shares of the Company's common

stock. Given that the price per share of the Company's common stock at the close of trading on

October 31, 2018 was $3.66, Defendant Galvan owned approximately $187,531 worth of Lannett

stock.

39.     For the fiscal year ended June 30, 2018, Defendant Galvan received $763,745 in compensation from the Company. This included $415,000 in salary, $207,505 in restricted stock awards, $24,997 in option awards, $86,730 in non-equity incentive plan compensation, and $29,513 in all other compensation.

40.     The Company's 2018 Proxy Statement stated the following about Defendant Galvan:

> **Martin P. Galvan, CPA** was appointed as the Company's Vice President of Finance and Chief Financial Officer in August 2011.  Most recently, he was Chief Financial Officer of CardioNet, Inc., a medical technology and service company.  From 2001 to 2007, Mr. Galvan was employed by Viasys Healthcare Inc., a healthcare technology company that was acquired by Cardinal Health, Inc. in June 2007.  Prior to the acquisition, he served as Executive Vice President, Chief Financial Officer and Director Investor Relations.  From 1999 to 2001, Mr. Galvan served as Chief Financial Officer of Rodel, Inc., a precision surface technologies company in the semiconductor industry.  From 1979 to 1998, Mr. Galvan held several positions with Rhone-Poulenc Rorer Inc., a pharmaceutical company, including Vice President, Finance — The Americas; President & General Manager, RPR Mexico & Central America; Vice President, Finance, Europe/Asia Pacific; and Chief Financial Officer, United Kingdom & Ireland.  Mr. Galvan began his career with the international accounting firm Ernst & Young LLP.  He earned a Bachelor of Arts degree in economics from Rutgers University and is a member of the American Institute of Certified Public Accountants.

### Defendant Kozlowski

41.     Defendant John Kozlowski ("Kozlowski") has served as the Company's Chief of Staff and Strategy Officer since April 2018. Prior to that, Defendant Kozlowski served as the Company's Chief Operating Officer in October 2017, Vice President of Financial Operations & Corporate Controller in 2016, and as Corporate Controller in 2009 when he joined the Company. According to the 2018 Proxy Statement, as of October 31, 2018, Defendant Kozlowski beneficially owned 24,476 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2018 was $3.66, Defendant Kozlowski owned approximately $89,582 worth of Lannett stock.

13

42.    For the fiscal year ended June 30, 2018, Defendant Kozlowski received $596,314 in compensation from the Company. This included $325,000 in salary, $171,624 in restricted stock, $67,921 in non-equity incentive plan compensation, and $31,796 in all other compensation.

43.    The Company's 2018 Proxy Statement stated the following about Defendant Kozlowski:

> **John Kozlowski** joined the Company in 2009 as Corporate Controller and was promoted in 2016 to Vice President Financial Operations & Corporate Controller. In April 2018, Mr. Kozlowski was promoted to Chief of Staff and Strategy Officer. In October 2017, Mr. Kozlowski was promoted to Chief Operating Officer. Prior to joining the Company, Mr. Kozlowski served in senior finance and accounting roles for Optium Corporation and Finisar Australia. He earned a Bachelor of Arts degree in finance from James Madison University and a Master of Business Administration degree from Rider University.

### Defendant Drabik

44.    Defendant David Drabik ("Drabik") has served as a Company director since January 2011. He also serves as a member of the Audit Committee, Compensation Committee, Strategic Planning Committee, and as Chairman of the Governance and Nominating Committee. According to the 2018 Proxy Statement, as of October 31, 2018, Defendant Drabik beneficially owned 49,747 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2018 was $3.66, Defendant Drabik owned approximately $182,074 worth of Lannett stock.

45.    For the fiscal year ended June 30, 2018, Defendant Drabik received $266,006 in compensation from the Company. This included $116,000 in fees earned and $150,006 in stock awards.

46.    During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Drabik made the following sale of company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 18, 2015 | 12,500 | $ 61.55 | $ 769,375 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

47.     The Company's 2018 Proxy Statement stated the following about Defendant Drabik:

> **David Drabik** was elected a Director of the Company in January 2011.  Mr. Drabik is a National Association of Corporate Directors Governance Fellow.  Since 2002, Mr. Drabik has been President of Cranbrook & Co., LLC ("Cranbrook"), an advisory firm primarily serving the private equity and venture capital community.  At Cranbrook, Mr. Drabik assists and advises its clientele on originating, structuring and executing private equity and venture capital transactions.  From 1995 to 2002, Mr. Drabik served in various roles and positions with UBS Capital Americas (and its predecessor UBS Capital LLC), a New York City based private equity and venture capital firm that managed $1.5 billion of capital.  From 1992 to 1995, Mr. Drabik was a banker with Union Bank of Switzerland's Corporate and Institutional Banking division in New York City.  Mr. Drabik graduated from the University of Michigan with a Bachelor of Business Administration degree.

**Defendant Farber**

48.     Defendant Jeffrey Farber ("Farber") has served as a Company director since May 2006 and as Chairman of the Board from July 2012 to July 1, 2018. He also serves as a member of the Strategic Planning Committee. Defendant Farber initially joined the Company in August 2003 as Secretary. According to the 2018 Proxy Statement, as of October 31, 2018, Defendant Farber beneficially owned 4,483,955 shares of the Company's common stock, which represented 11.43% of the Company's outstanding shares of common stock on that date. Given that the price per share of the Company's common stock at the close of trading on October 31, 2018 was $3.66, Defendant Farber owned approximately $16.4 million worth of Lannett stock.

15

49.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Farber made the following sales of company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| February 12, 2015 | 25,000 | $  58.12 | $  1,453,000 |
| February 13, 2015 | 10,000 | $  58.32 | $     583,200 |

Thus, in total, before the fraud was expose, he sold 35,000 Company shares on inside information, for which he received approximately $2 million. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

50.     In addition, Defendant Farber is the owner of Auburn, a generic distributor used by the Company. During the fiscal years ended June 30, 2018, 2017, and 2016, the Company attributed net sales of $3.9 million, $3.7 million and $3.1 million, respectively, to Auburn.  The Company's accounts receivable also included amounts due from Auburn of $585 thousand and $751 thousand at June 30, 2018 and 2017, respectively.

51.     For the fiscal year ended June 30, 2018, Defendant Farber received $247,006 in compensation from the Company. This included $97,000 in fees earned and $150,006 in stock awards.

52.     The Company's 2018 Proxy Statement stated the following about Defendant Farber:

**Jeffrey Farber** was appointed a Director of the Company in May 2006 and was appointed Chairman of the Board of Directors in July 2012.  On July 1, 2018, Mr. LePore succeeded Mr. Farber as the Chairman of the Board of Directors.  Mr. Farber joined the Company in August 2003 as Secretary.  Since 1994, Mr. Farber has been President and the owner of Auburn Pharmaceutical ("Auburn"), a national generic pharmaceutical distributor.  Prior to starting

Auburn, Mr. Farber served in various positions at Major Pharmaceutical ("Major"), where he was employed for over 15 years.  At Major, Mr. Farber was involved in sales, purchasing and eventually served as President of the Midwest division.  Mr. Farber also spent time working at Major's manufacturing division, Vitarine Pharmaceuticals, where he served on its Board of Directors.  Mr. Farber graduated from Western Michigan University with a Bachelor of Science Degree in Business Administration and participated in the Pharmacy Management Graduate Program at Long Island University.

The Governance and Nominating Committee concluded that Mr. Farber is qualified and should continue to serve, due, in part, to his significant experience in the generic drug industry and his ongoing role as the owner of a highly regarded and successful generic drug distributor.  His skills include a thorough knowledge of the generic drug marketplace and drug supply chain management.

**Defendant LePore**

53.     Defendant Patrick G. LePore ("LePore") has served as a Company director since July 2017 and as Chairman of the Board since July 2018. He also serves as a member of the Governance and Nominating Committee and the Strategic Planning Committee. According to the 2018 Proxy Statement, as of October 31, 2018, Defendant LePore beneficially owned 67,895 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2018 was $3.66, Defendant LePore owned approximately $ 248,495 worth of Lannett stock.

54.     For the fiscal year ended June 30, 2018, Defendant LePore received $129,785 in compensation from the Company. This included $94,000 in fees earned and $35,785 in stock awards.

55.     The Company's 2018 Proxy Statement stated the following about Defendant LePore:

**Patrick G. LePore** was appointed as a Director of the Company in July 2017.  On July 1, 2018, Mr. LePore succeeded Mr. Farber as Chairman of the Board of Directors.  Mr. LePore served as Chairman, Chief Executive Officer and President of Par Pharmaceuticals, Inc., until the company's acquisition by private equity investor TPG in 2012.  He remained as chairman of the new company where he led

17

the sale of the company to Endo Pharmaceuticals.  Mr. LePore began his career with Hoffmann LaRoche.  Later, he founded Boron LePore and Associates, a medical communications company, which he took public and was eventually sold to Cardinal Health.  He is a member of the board of directors of PharMerica and Innoviva, and is a trustee of Villanova University.  Mr. LePore earned his bachelor's degree from Villanova University and Master of Business Administration from Fairleigh Dickinson University.

The Governance and Nominating Committee concluded that Mr. LePore is well qualified and should be nominated to serve as a Director due, in part, to his understanding and experience as a Chief Executive Officer and director of highly regarded companies within the pharmaceutical industry.  Mr. LePore is an independent director as defined by the rules of the NYSE.

**Defendant Maher**

56.     Defendant James M. Maher ("Maher") served as a Company director from June 2013 until August 21, 2018. According to the 2017 Proxy Statement, as of October 31, 2017, Defendant Maher beneficially owned 27,297 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2017 was $19.90, Defendant Maher owned approximately $543,210 worth of Lannett stock.

57.     During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Maher made the following sale of company stock:

| Date | Number of Shares | Price | Proceeds |
|------|------------------|-------|----------|
| September 1, 2016 | 1,478 | $  33.91 | $   50,118 |

His insider sale made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrates his motive in facilitating and participating in the scheme.

58.     For the fiscal year ended December 31, 2018, Defendant Maher received $240,006 in compensation from the Company. This included $90,000 in fees earned and $150,006 in stock awards.

59.     The Company's 2018 Proxy Statement stated the following about Defendant Maher:

> **James M. Maher, 65**, was appointed as a Director of the Company in June 2013.   He   spent   his   entire   37   year   professional   career   with PricewaterhouseCoopers (PwC) LLP, including 27 years as a partner, before retiring in June 2012.  Most recently, Mr. Maher served as the managing partner of PwC's U.S. assurance practice, comprised of more than 1,100 partners and 12,000 staff.  Previously, he served as the regional assurance leader for the metro assurance practice.   During his tenure at PwC, Mr. Maher worked closely with senior management   at   several   multinational   companies,   dealing   extensively   with significant   acquisitions,   divestitures,   initial   public   offerings   and   secondary offerings.  Mr. Maher earned a bachelor's degree in Accounting from LIU Post.
>
> The Governance and Nominating Committee concluded that Mr. Maher is well qualified and should be nominated to serve as a Director, due to his extensive experience   in   the   public   accounting   profession.     Additionally,   Mr.   Maher   has significant   experience   in   dealing   with   acquisitions,   divestitures,   initial   public offerings and secondary offerings.  Mr. Maher is an independent director as defined by the rules of the NYSE.

**Defendant Paonessa**

60.     Defendant Albert Paonessa, III ("Paonessa") has served as a Company director since July 2015. He also serves as Chairman of the Strategic Planning Committee. According to the 2018 Proxy Statement, as of October 31, 2018, Defendant Paonessa beneficially owned 30,277 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2018 was $3.66, Defendant Paonessa owned approximately $110,813 worth of Lannett stock.

61.     For the fiscal year ended June 30, 2018, Defendant Paonessa received $248,006 in compensation from the Company. This included $98,000 in fees earned and $150,006 in stock awards.

62.    In addition, since May 2017, Defendant Paonessa has served as the CEO of KeySource, a generic distributor used by the Company. During the fiscal years ended June 30, 2018 and 2017, the Company attributed net sales of $1.9 million and $1.7 million to KeySource.  The company's accounts receivable also included amounts due from KeySource of $514 thousand and $606 thousand as of June 30, 2018 and 2017.

63.    The Company's 2018 Proxy Statement stated the following about Defendant Paonessa:

> **Albert Paonessa, III** was appointed as a Director of the Company in July 2015.  In May 2017, Mr. Paonessa was appointed the Chief Executive Officer of KeySource Acquisition Inc., a generic pharmaceuticals distributor ("KeySource").  Prior to that, Mr. Paonessa served as the President of Anda, Inc., the fourth largest distributor of generic drugs in the U.S., for over 10 years until January 2015.  He previously served as Anda's Senior Vice President of Sales and before that as Vice President of IT.  Earlier, Mr. Paonessa was Vice President of Operations for VIP Pharmaceuticals, which was acquired by Anda's parent company Andrx, in 2000.  Mr. Paonessa earned a Bachelor of Arts degree in Interpersonal Communications from Bowling Green State University.
>
> The Governance and Nominating Committee concluded that Mr. Paonessa is well qualified and should be nominated to serve as a Director due, in part, to his significant experience in different executive roles within the generic pharmaceutical industry.  Additionally, Mr. Paonessa has a strong operational and technical background, especially in the areas of sales, IT, planning and budgeting and business development.

### Defendant Taveira

64.    Defendant Paul Taveira ("Taveira") has served as a Company director since May 2012. He also serves as a member of the Audit Committee, the Governance and Nominating Committee, and as Chairman of the Compensation Committee. According to the 2018 Proxy Statement, as of October 31, 2018, Defendant Taveira beneficially owned 47,970 shares of the Company's common stock. Given that the price per share of the Company's common stock at the close of trading on October 31, 2018 was $3.66, Defendant Taveira owned approximately $175,570 worth of Lannett stock.

65. During the First Relevant Period, when the Company materially misstated information to the investing public to keep the stock price inflated, and before the scheme was exposed, Defendant Taveira made the following sales of company stock:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| June 16, 2014 | 1,000 | $  46.94 | $   46,940.00 |
| March 6, 2015 | 2,500 | $  63.07 | $   157,675.00 |

Thus, in total, before the fraud was expose, he sold 3,500 Company shares on inside information, for which he received approximately $204,615. His insider sales made with knowledge of material non-public information before the material misstatements and omissions were exposed demonstrate his motive in facilitating and participating in the scheme.

66. For the fiscal year ended June 30, 2018, Defendant Taveira received $240,006 in compensation from the Company. This included $90,000 in fees earned and $150,006 in stock awards.

67. The Company's 2018 Proxy Statement stated the following about Defendant Taveira:

**Paul Taveira** was appointed a Director of the Company in May 2012. Mr. Taveira has been Chief Executive Officer of the National Response Corporation, an international firm specializing in environmental services, since June 2015. He previously served on the Board of Directors and as the Chief Executive Officer of A&D Environmental Services Inc., an environmental and industrial services company. From 2007 to 2009, Mr. Taveira was a Managing Partner of Precision Source LLC, a manufacturer of precision parts for various industries across the United States. From 1997 to 2007, Mr. Taveira held several positions at PSC Inc., a national provider of environmental services, including President, Vice President and Regional General Manager. From 1987 to 1997, Mr. Taveira held several management positions with Clean Harbors Inc., an international provider of environmental and energy services. Mr. Taveira graduated from Worcester State University with a Bachelor of Science degree in Biology.

The Governance and Nominating Committee concluded that Mr. Taveira is well qualified and should be nominated to serve as a Director due, in part, to his

understanding and experience as a Chief Executive Officer and Director of various companies.  Mr. Taveira is an independent director as defined by the rules of the NYSE.

## FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS

68.     By reason of their positions as officers and/or directors of Lannett  and because of their ability to control the business and corporate affairs of Lannett, the Individual Defendants owed Lannett and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Lannett  in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of Lannett and its shareholders so as to benefit all shareholders equally.

69.     Each director and officer of the Company owes to Lannett and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

70.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Lannett, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.

71.     To discharge their duties, the officers and directors of Lannett were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

72.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable

violation of their obligations as directors and officers of Lannett, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company. The conduct of the Individual Defendants who were also officers and directors of the Company has been ratified by the remaining Individual Defendants who collectively comprised Lannett's Board at all relevant times.

73.     As senior executive officers and directors of a publicly-traded company whose common stock is registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, and had a duty to cause the Company to disclose omissions of material fact in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information.

74.     To discharge their duties, the officers and directors of Lannett were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of Lannett were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to Lannett's own Code of Conduct;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how Lannett conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of Lannett and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Lannett's operations would comply with all applicable laws and Lannett's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)     exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)     examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate

disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

75.     Each of the Individual Defendants further owed to Lannett and the shareholders the duty of loyalty requiring that each favor Lannett's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence or knowledge of the affairs of the Company to gain personal advantage.

76.     At all times relevant hereto, the Individual Defendants were the agents of each other and of Lannett and were at all times acting within the course and scope of such agency.

77.     Because of their advisory, executive, managerial, and directorial positions with Lannett, each of the Individual Defendants had access to adverse, non-public information about the Company.

78.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by Lannett.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

79.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and assisted each other in breaching their respective duties.

80.     The purpose and effect of the conspiracy, common enterprise, and common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, and violations of Section 14(a) of the Exchange Act.

25

81. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants, who are directors of Lannett, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and common course of conduct complained of herein.

82. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

83. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Lannett and was at all times acting within the course and scope of such agency.

## LANNETT'S CODE OF CONDUCT

84. The Company's Code of Business Conduct and Ethics (the "Code of Conduct") states that it "has been adopted to foster and promote a common set of fundamental values and operating principles. This Code applies to all employees, officers and directors, of the Company and its subsidiaries."

85. The Code of Conduct provides that Lannett's employees, officers, and directors should avoid gaining unfair advantages through, *inter alia*, misrepresenting material facts. The

Code of Conduct specifically states that "[e]ach employee, officer and director should endeavor to deal fairly with the Company's customers, suppliers, competitors and employees. No one should take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any other unfair-dealing practice."

86.     Under a section titled, "Company Assets," the Code of Conduct outlines the responsibility of Lannett employees, officers, and directors with respect to Company assets, stating in relevant part, "[a]ll employees, officers and directors shall protect the Company's assets and ensure they are being used efficiently and for legitimate business purposes. Theft, carelessness and waste have a direct impact on the Company's profitability.

87.     The Code of Conduct also emphasizes the Company's compliance with laws and regulations, stating in relevant part:

**Compliance**
The Company promotes compliance with laws, including insider trading laws, and rules and regulations such as Standard Operating Procedures (SOPs), current Good Manufacturing Practices (cGMPs), Good Laboratory Practices (GLPs). The Company will conduct periodic audits of compliance with the Code and investigations will be performed to determine validity of any allegations of wrongdoing. Violations of the Code will be addressed promptly and consistently upon the outcome of such investigations. Anyone determined to be involved in such violations will face disciplinary penalties up to including termination, as appropriate.

88.     The Code of Conduct also provides reporting guidelines for suspected violations of laws, rules, regulations, or the Code of Conduct stating in relevant part:

**Reporting**
The Company promotes ethical behavior and encourages employees to talk to supervisors, managers or other appropriate personnel when in doubt about the best course of action in a particular situation. Additionally, employees are required to report violations of laws, rules, regulations or the Code to appropriate personnel. In order to encourage reporting of such violations it is Company policy to prohibit retaliation for reports made in good faith. Any person who takes action in retaliation against an employee who has raised an issue in good faith will be subject to disciplinary actions up to and including termination, as appropriate.

89.     The Individual Defendants violated the Code of Conduct by allowing the Company

to engage in the Anti-Competitive Misconduct in violation of applicable state and federal laws,

and the scheme to issue materially false and misleading statements to the public and to facilitate

and disguise the Individual Defendants' insider sales and violations of law, including breaches of

fiduciary duty, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the

Exchange Act.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### Background

90.     Lannett specializes in the development, manufacture, marketing, and distribution

of generically branded pharmaceuticals products. Over the past few years, the Company's top five

products accounted for over 50% of its total net sales.

91.     During the Company's 2018 fiscal year ended June 30, 2018, it reported total net

sales of over $684 million. The Company attributed its growth to, among other things, its string of

abbreviated new drug application approvals ("ANDAs"), strategic partnerships and new drug

launches, and its strong historical record of regulatory compliance.

92.     The Company distributes several products which are manufactured by other

companies such as JSP. Indeed, JSP was the Company's main manufacturer, making the

Distribution Agreement a critical part of the Company's success. For example, during the fiscal

years 2018, 2017, and 2016, purchases of finished goods from JSP made up 37%, 36%, and 52%

of the Company's inventory purchases for those respective years. Furthermore, Lannett's reported

value stemming from the products obtained by JSP in connection with Distribution Agreement

was $253 million just in the fiscal year ended June 20, 2018. This value included over $245 million

from Levothyroxine (which was markedly higher than the Company's reported value of $174

million for Levothyroxine for the fiscal year ended June 30, 2017). Overall, finished goods obtained from JSP accounted for 36%-52% of the Company's inventory purchases during the fiscal years 2016, 2017, and 2018. As a result of the Distribution Agreement, Lannett held up to a 14% market share of Digoxin and a 10% market share of Levothyroxine.

## The Distribution Agreement

93.   On March 23, 2004, after negotiations led by Defendant Bedrosian, JSP and Lannett entered into the Distribution Agreement. Under the Distribution Agreement, JSP would manufacture certain drug tablets which Lannett would then distribute to the market. The Distribution Agreement did not include profit-sharing provisions and allowed Lannett the flexibility to adjust the prices of the products as it saw fit. However, JSP was inhibited by the Distribution Agreement from raising its own prices to a cap of 3% every year. Through the Distribution Agreement, JSP obtained 4 million shares of Lannett shares. At the time the Distribution Agreement was initiated, this represented about 17% of the Company's outstanding shares.

94.   Throughout Defendant Bedrosian's tenure with the Company, due to his positive relationship with JSP, he continued negotiations with JSP in order to extend the Distribution Agreement beyond its initial term. On August 19, 2013, the Distribution Agreement was extended for a five-year period and set to expire on March 23, 2019. The extension of the Distribution Agreement permitted Lannett to maintain its position as the exclusive distributor of the following JSP products: Digoxin, Levothyroxine, and Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP. JSP was also issued 1.5 million more Company shares. In connection with the issuance of the additional shares, the Company recorded a $20.1 million expense in cost of sales, which reflected the fair market value of the shares on August 19, 2013.

95.     Further extension of the Distribution Agreement beyond the new five-year term would allow the Distribution Agreement to continue until March 23, 2024 and require the Company to issue an additional 1.5 million shares of Company stock to JSP.

96.     During the Second Relevant Period, the Company made certain risk disclosures related to the Distribution Agreement that failed to mention risks related to JSP not extending the contract and/or failing to provide the Company with products. Specifically, the Company's disclosures stated the following in its SEC filings: "During the renewal term of the JSP Agreement, the Company is required to use commercially reasonable efforts to purchase minimum dollar quantities of JSP products. There is no guarantee that the Company will be able to meet the minimum purchase requirements. If the Company does not meet the minimum purchase requirements, JSP's sole remedy is to terminate the JSP Distribution Agreement."

97.     After the Company had accumulated significant debt and experienced workforce cuts associated with its acquisition of Kremers Urban Pharmaceuticals, Inc. in November 2015, and the Company began to increase its drug prices, and after the FDA announced plans to withdraw approval of one of Lannett's generic drugs used to treat hyperactivity disorder, the Company announced on September 25, 2017 that Defendant Bedrosian would be stepping down as CEO. Knowing that his departure from the Company would risk Lannett's business relationship with JSP, Defendant Bedrosian sold over $2.5 million of his shares in the Company in November 2017. In addition, a number of employees at the Company confirmed the fragility of the Distribution Agreement in light of Defendant Bedrosian's departure from Lannett.

98.     As JSP's relationship with Lannett dwindled, JSP began forming alliances with other drug distribution companies. In spite of the increasing likelihood that the Distribution Agreement was coming to an end, the Company failed to inform the public and investors that the

its agreement with JSP was on the brink of dissolving. Rather, the Company continued to represent that the relationship was strong and that JSP had a vested interest in the Company. Although the Company had issued a large portion of shares to JSP in connection with the Distribution Agreement, JSP liquidated its interest in the Company and was not accounted for as a large shareholder of the Company in its SEC filings. However, this did not stop certain Individual Defendants from stating otherwise.

### The Anti-Competitive Misconduct

99.     During the First Relevant Period, the Company engaged in price-fixing and other anti-competitive conduct with several of its competitors in the generic drug industry as part of an industry-wide collusive effort to divvy up the market and raise and maintain elevated pricing for certain generic drugs. At least five of the Company's drugs were implicated by the Anti-Competitive Misconduct: Doxy Mono, Digoxin, Levothyroxine, Acetazolamide, and Ursodiol.

100.    Prior to 2013, the price for branded drugs and generic drugs alike experienced downward pricing trends once the first generic drug manufacturer entered the market below the price of its branded bioequivalent. However, in 2013, pricing patterns in the generic drug market shifted in a way that eliminated price drops previously attributed to the emergence of generic counter-parts to certain branded pharmaceuticals.

101.    In 2014, the Company received several subpoenas related to state and federal investigations of the Anti-Competitive Misconduct. For example, on November 6, 2014, the Company filed a Form 10-Q with the SEC announcing that its Senior Vice President of Sales and Marketing was served with a grand jury subpoena related to a federal investigation on generic drug companies concerning potential violations of the Sherman Act. The Company was soon after served with a similar subpoena itself on December 8, 2014.

102.    On December 14, 2016, the AG Action was filed by the Connecticut Attorney General on behalf of 20 state attorneys general against several generic drug companies alleging anticompetitive behavior and price-fixing. The AG Action tied the upward trend in generic drug prices to illegal collusion between certain generic drug companies.

103.    The first complaint in the AG Action maintained that investigations were ongoing with respect to culpable parties and the number of generic drugs involved in the scheme. The AG Action stated that the price-fixing and other anticompetitive conduct were achieved through trade shows hosted by Generic Pharmaceutical Association, the National Association of Chain Drug Stores, Healthcare Distribution alliance, and Efficient Collaborative Retail Marketing, trade shows often attended by Lannett. Furthermore, the AG Complaint explained that agreements between generic drug companies were refined through, *inter alia*, dinners, phone calls, text messages, and emails.

104.    On October 31, 2017, the AG Action was amended to include Lannett and two drugs sold by the Company. The amended complaint based the information in part on subpoenas received by Lannett in July 2014, when the Connecticut Attorney General was investigating its claims.

105.    The AG Action as amended outlined the following allegations, among others, against the named defendants, including Lannett: the companies engaged in the conspiracy during trade shows as described above and in other communications where they shared information specific to their pricing practices, agreements with customers, communicated and agreed amongst themselves to subdue certain competition in the market so as to maintain or raise the price of certain drugs, and discern each companies' share of the market.

106.    Lannett specifically increased its prices for particular drug products in connection with the Anti-Competitive Misconduct. One such drug was Doxy Mono, which the Company increased the price for in 2013. Details surrounding the Company's participation in the scheme were revealed through the AG Action and the First Class Action. Certain of Lannett's competitors, such as Heritage Pharmaceuticals Inc., colluded with the Company in order to accomplish the price spike in Doxy Mono. Lannett also increased its prices for Digoxin, which, along with Levothyroxine, the Company obtained from JSP through the Distribution Agreement. These two drugs represented almost 50% of the Company's sales in 2013. Digoxin experienced a coordinated price-spike in 2014, which continued into 2015 when total sales of Digoxin amounted to $505 million—almost triple the price of Digoxin's market sales in 2013. During the time of the price-spikes, there were no market forces that would have explained the significant price increase. Similar price-spikes were revealed for three of Lannett's other drug products, Levothyroxine, Acetazolamide, and Ursodiol in the AG Action, the First Class Action, and through federal and state investigations into the Anti-Competitive Misconduct. These drugs represented a significant portion of the Company's annual sales from 2013-2016, accounting for around 56%-72% of the Company's total annual sales. As such, the Company's financial success depended on sustaining higher prices for these products during the First Relevant Period.

107.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to participate in the Anti-Competitive Misconduct, despite the Company's assurance that it complied with the law and would not be affected by the investigations into the industry-wide scheme. As a result of the Anti-Competitive Misconduct, the Individual Defendants caused the Company to reap inflated sales while representing to the public and

investors that its growth was attributable to market competition and the Company's aggressive pricing strategies.

108.    Also in breach of their fiduciary duties, The Individual Defendants failed to conduct adequate due diligence over the Company's internal controls over its pricing methodologies and disclosure, causing them to fail to discover and/or timely correct the misconduct.

109.    In further breach of their fiduciary duties, the Individual Defendants made the false and misleading statements below concerning, *inter alia*, the Anti-Competitive Misconduct.

### **False and Misleading Statements as to the Anti-Competitive Misconduct**

#### *July 15, 2014-Oppenheimer Analyst Report*

110.    On July 15, 2014, an analyst from Oppenheimer issued a report on Lannett concerning a recent article written by the *New York Times* on July 8, 2014 scrutinizing Lannett's price increases and its corresponding rising revenue rates. In particular, the *New York Times* article criticized the Company's increased pricing of Digoxin through 2013. The Oppenheimer report included published statements made by Defendants Bedrosian and Galvan speaking on behalf of Lannett. Defendants Bedrosian and Galvan maintained that it was "Lannett's view is that the company has a window of opportunity on price increases until 2016, when the generics wave begins to recede. Management is even eyeing additional price increases later this year, although the company would not specify on which franchises. With respect to digoxin specifically, management still believes that it is at the low end of market pricing compared to competitors…."

#### *July 16, 2014-8-K and Press Release*

111.    On July 16, 2014, Lannett issued a press release filed on a Form 8-K with the SEC announcing that it had received a subpoena along with interrogatories from the Connecticut Attorney General related to the Company's pricing of Digoxin. The press release noted that the

subpoena and interrogatories were part of the Connecticut Attorney General's investigation of "whether anyone engaged in activities that resulted in (a) fixing, maintaining or controlling prices of digoxin or (b) allocating and dividing customers or territories relating to the sale of digoxin in violation of Connecticut antitrust law." Defendant Bedrosian, as quoted in the press release stated, "The Company maintains that it acted in compliance with all applicable laws and regulations and intends to cooperate with the Connecticut Attorney General's investigation."

112. The statements in ¶¶ 110-111 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants misrepresented the Company's pricing strategy of generic drugs, including Digoxin, and Company's risk of being implicated by regulatory investigation and allegations of anticompetitive misconduct. In addition, the statements misled investors regarding the extent to which Defendants Bedrosian and Galvan knew or were aware of the Company's engagement in illegal activity related to price-fixing and the Anti-Competitive Misconduct in general. Furthermore, the statements downplayed the potential implication of the Company; or regulatory impact on Lannett's business operations and financial results/prospects arising from the Anti-Competitive Misconduct.

### *August 29, 2014 Form 10-K*

113. On August 29, 2014 the Company filed with the SEC its annual report for the fiscal year ended June 30, 2014 on a Form 10-K (the "2014 10-K"), which was signed by Defendants Bedrosian, Galvan, Farber, Drabik, Taveira, and Maher, and non-party G. Michael Landis ("Landis").

114. The 2014 10-K maintained that the Company "continue(d] to improve [its] financial performance by expanding [its] line of generic products, increasing unit sales to current customers,

creating manufacturing efficiencies, and managing [its] overhead and administrative costs." The

2014 10-K additionally described competition in the industry, stating in relevant part:

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.

We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors.

\* \* \*

We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost effective manner to maintain our revenues and gross margins.

115.   The 2014 10-K also noted the Company's price fluctuations, stating that "[p]ricing

pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in

future periods [and/ changes in future product sales mix may also occur."

116.    Attached to the 2014 10-K were certifications pursuant to Rule 13a-14(a) and 15d-14(a) under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2014 10-K.

### November 6, 2014 10-Q

117.    On November 6, 2014, the Company filed its quarterly report on a Form 10-Q for the period ended September 30, 2014 (the "November 2014 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which discussed the Company's financial results, reporting in relevant part: "overall increase in net sales [due to] ...favorable trends in product pricing on several key products during the period[.]" In addition, the November 2014 10-Q outlined the Company's approach to maintaining its gross profit, stating in relevant part that "[t]he Company is continuously seeking to keep product costs low, however there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods."

118.    Attached to the November 2014 10-Q were SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the November 2014 10-Q.

### December 16, 2014 Proxy Statement

119.    On December 16, 2014, the Company filed its Schedule 14A with the SEC (the "2014 Proxy Statement"). Defendants Bedrosian, Farber, Drabik, Taveira, and Maher solicited the 2014 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[2]

---

[2] Plaintiff's allegations with respect to the misleading statements in the 2014 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

120.    The 2014 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board has adopted a Code of Business Conduct and Ethics (the "code of ethics").  The code of ethics applies to all employees including the Company's Chief Executive Officer, Chief Financial Officer, President, Corporate Controller, and other finance employees."

121.    The 2014 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

122.    The Individual Defendants also caused the 2014 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to "focus [Company] executives on creating long-term shareholder value and directly linking corporate and individual performance goals with the results of the Company" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

123.    The 2014 Proxy Statement also failed to disclose, *inter alia* that: (1) Lannett was a participant in the Anti-Competitive Misconduct; (2) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (3) the Company lacked internal controls over the its pricing procedures for at least five of its drug products; (4) Lannett was at risk for regulatory investigation and enforcement that would negatively impact the Company; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements during the First Relevant Period regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact.

***February 6, 2015 Form 10-Q***

124.   On February 6, 2015, the Company filed its quarterly report on a Form 10-Q for the period ended December 31, 2014 (the "February 2015 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which discussed the Company's financial results and reported net sales of $114.8 million, 71% growth for that fiscal period. The February 2015 10-Q also attributed its growing net sales to, *inter alia*, favorable pricing trends, stating that:

> Product price increases contributed $50.9 million to the overall increase in net sales, partially offset by decreased volumes of $3.4 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.
>
> * * *
>
> Thyroid Deficiency. Net sales of drugs used for the treatment of thyroid deficiency increased by $18.3 million, primarily as a result of price increases on key products. Increased volumes also added to the increase in net sales.
>
> Gallstone. Net sales of drugs used for gallstones increased by $15.6 million. The increase in net sales was primarily attributable to price increases, partially offset by decreased volumes.
>
> * * *
>
> Migraine. Net sales of drugs used to treat migraines increased by $4.6 million. The increase in net sales was primarily attributable to price increases on key products.
>
> * * *
>
> Net sales to wholesaler/distributor increased as a result of increased sales in a variety of products for thyroid deficiency, gallstones and cardiovascular, as discussed above.
>
> * * *
>
> While the Company is continuously striving to keep product costs low, there can be no guarantee that gross profit percentages will stay consistent in future periods. Pricing pressure from competitors and costs of producing or purchasing new drugs may also fluctuate in future periods. Changes in future product sales mix may also occur.

125.   Attached to the February 2015 10-Q were SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the February 2015 10-Q.

***May 8, 2015 Form 10-Q***

126.     On May 8, 2015, the Company filed its quarterly report on a Form 10-Q for the period ended March 31, 2015 (the "March 2015 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which attributed the Company's increasing revenue to product sales. The March 2015 10-Q stated specifically that:

> For the third quarter of Fiscal Year 2015, net sales increased to $99.4 million, representing 24% growth over the third quarter of Fiscal Year 2014. Gross profit increased to $75.6 million compared to $56.1 million in the prior-year period and gross profit percentage increased to 76% compared to 70% in the prior-year period.
>
> * * *
>
> Product price increases contributed $29.5 million to the overall increase in net sales, partially offset by decreased volumes of $10.1 million. The Company experienced favorable trends in product pricing on several key products during the period, as discussed below. Although the Company has benefited from these favorable pricing trends, the level of competition in the marketplace is constantly changing and the Company cannot guarantee that these pricing trends will continue.
>
> * * *
>
> Net sales to wholesaler/distributor increased as a result of increased sales in a variety of products for thyroid deficiency and gallstone, partially offset by decreases in cardiovascular.

127.     Attached to the March 2015 10-Q were SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the March 2015 10-Q.

**August 27, 2015 Form 10-K**

128.     On August 27, 2015 the Company filed with the SEC its annual report for the fiscal year ended June 30, 2015 on a Form 10-K (the "2015 10-K"), which was signed by Defendants Bedrosian, Galvan, Farber, Drabik, Taveira, Maher, and Paonessa, and by non-party Landis.

129.     The 2015 10-K commented again on the industry-wide competition, stating in relevant part:

> We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies, and managing our overhead and administrative costs.

* * *

**Competition**

The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position over the past five years.

We compete with other manufacturers and marketers of generic and brand name drugs. Each product manufactured and/or sold by us has a different set of competitors. The list below identifies the companies with which we primarily compete with respect to each of our major products.

* * *

We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost effective manner to maintain our revenues and gross margins.

130.    Attached to the 2015 10-K were SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2015 10-K.

**December 8, 2015 Proxy Statement**

131.    On December 8, 2015, the Company filed its Schedule 14A with the SEC (the "2015 Proxy Statement"). Defendants Bedrosian, Farber, Drabik, Taveira, and Maher solicited the

2015 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[3]

132.    The 2015 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board has adopted a Code of Business Conduct and Ethics (the "code of ethics"). The code of ethics applies to all employees including the Company's Chief Executive Officer, Chief Financial Officer, President, Corporate Controller, and other finance employees."

133.    The 2015 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

134.    The Individual Defendants also caused the 2015 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to "focus [Company] executives on creating long-term shareholder value and directly linking corporate and individual performance goals with the results of the Company" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

135.    The 2015 Proxy Statement also failed to disclose, *inter alia* that: (1) Lannett was a participant in the Anti-Competitive Misconduct; (2) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (3) the Company lacked internal controls over the its pricing procedures for at least five of its drug products; (4)

---

[3] Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

Lannett was at risk for regulatory investigation and enforcement that would negatively impact the Company; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements during the First Relevant Period regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact.

### *November 5, 2015 Form 10-Q*

136.    On November 5, 2015, the Company filed its quarterly report on a Form 10-Q for the period ended October 30, 2015 (the "November 2015 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which attributed the Company's growing revenue to increased sales of the Company's thyroid drug. The November 2015 10-Q stated specifically that the Company experienced "increased volumes ... due to above average customer purchases in the fourth quarter of Fiscal Year 2014 in anticipation of a price increase in the first quarter of Fiscal Year 2015[.]"

137.    The November 2015 10-Q contained SOX certifications signed by Defendants Bedrosian and Galvan.

### *February 9, 2016 Form 10-Q*

138.    On February 9, 2016, the Company filed its quarterly report on a Form 10-Q for the period ended December 31, 2015 (the "February 2016 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which reported an increase in net sales by 11% to 127.1 million for the fiscal period.

139.    The February 2016 10-Q contained SOX certifications signed by Defendants Bedrosian and Galvan.

### *May 10, 2016 Form 10-Q*

140.    On May 10, 2016, the Company filed its quarterly report on a Form 10-Q for the period ended March 31, 2016 (the "May 2016 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which reported that Lannett's "net sales  increased to $163.7 million, which included 69.9 million of net sales from recently acquired KUPI. . .Gross profit, including the $23.6 million settlement agreement, decreased to $57.5 million compared to $75.6 million in the prior-year period and gross profit percentage decreased to 41% compared to 76% in the prior-year period."

141.    The May 2016 10-Q contained SOX certifications signed by Defendants Bedrosian and Galvan.

### *August 29, 2016 Form 10-K*

142.    On August 29, 2016 the Company filed with the SEC its annual report for the fiscal year ended June 30, 2016 on a Form 10-K (the "2016 10-K"), which was signed by Defendants Bedrosian, Galvan, Farber, Drabik, Taveira, Maher, and Paonessa, and non-party Landis.

143.    The 2016 10-K outlined industry and market competition in the generic pharmaceutical industry and noted its competitors for certain drugs. The 2016 10-K stated in relevant part:

> We are focused on increasing our market share in tile generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies and managing our overhead and administrative costs.
>
> * * *
>
> **Competition**
> The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of

orders. We ensure that our products are available from national suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position.

We compete with other manufacturers and marketers of generic and brand-name drugs. Each product manufactured and/or sold by us has a different set of competitors.

* * *

The generic pharmaceutical industry is highly competitive. We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost effective manner to maintain our revenues and gross margins.

144. Attached to the 2016 10-K were SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2016 10-K.

### December 12, 2016 Proxy Statement

145. On December 12, 2016, the Company filed its Schedule 14A with the SEC (the "2016 Proxy Statement"). Defendants Bedrosian, Farber, Drabik, Taveira, Maher, and Paonessa solicited the 2016 Proxy Statement filed pursuant to Section 14(a) of the Exchange Act, which contained material misstatements and omissions.[4]

_____

[4] Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy Statement are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants, and they do not allege, and do not sound in, fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter,

146.    The 2016 Proxy Statement stated, regarding the Company's Code of Conduct, that, "[t]he Board has adopted a Code of Business Conduct and Ethics (the "code of ethics"). The code of ethics applies to all employees including the Company's Chief Executive Officer, Chief Financial Officer, President, Corporate Controller, and other finance employees."

147.    The 2016 Proxy Statement was false and misleading because, despite assertions to the contrary, its Code of Conduct was not followed, as evidenced by the numerous false and misleading statements alleged herein, the insider trading engaged in by five of the Individual Defendants, and the Individual Defendants' failures to report violations of the Code of Conduct.

148.    The Individual Defendants also caused the 2016 Proxy Statement to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to "focus [Company] executives on creating long-term shareholder value and directly linking corporate and individual performance goals with the results of the Company" while failing to disclose that the Company's share price was artificially inflated as a result of false and misleading statements alleged herein.

149.    The 2016 Proxy Statement also failed to disclose, *inter alia* that: (1) Lannett was a participant in the Anti-Competitive Misconduct; (2) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (3) the Company lacked internal controls over the its pricing procedures for at least five of its drug products; (4) Lannett was at risk for regulatory investigation and enforcement that would negatively impact the Company; and (5) the Company failed to maintain internal controls. Due to the foregoing, Defendants' statements during the First Relevant Period regarding the Company's business, operations, and prospects were materially false, misleading, and lacked a reasonable basis in fact.

*February 3, 2017 Form 10-Q*

---

or recklessness with regard to these allegations and related claims.

150.     On February 3, 2017 the Company filed its quarterly report on a Form 10-Q for the period ended December 31, 2016 (the "February 2017 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which reported that Lannett's "net sales increased to $170.9 million compared to $127 .1 million in the same prior-year period" and that "[g]ross profit increased to $88.1 million compared to $71.6 million in the prior-year period [a 23% increase] and gross profit percentage decreased to 52% compared to 56% in the prior-year period."

151.     The February 2017 10-Q contained SOX certifications signed by Defendants Bedrosian and Galvan.

**May 5, 2017 Form 10-Q**

152.     On May 5, 2017, the Company filed its quarterly report on a Form 10-Q for the period ended March 31, 2017 (the "May 2017 10-Q"), which was signed by Landis and Defendants Bedrosian and Galvan, and which attributed the Company's increased sales to "increased volumes." The May 2017 10-Q also noted the impact of competitive pricing on net sales, stating that:

> Net sales were impacted by competitive pricing pressure across a number of products, product mix and changes within distribution channels. Although the Company has benefited in the past from favorable pricing trends, the trends are stabilizing and in many instances, have reversed. The level of competition in the marketplace is constantly changing and the Company cannot predict with certainty that these trends will continue.

153.     The May 2017 10-Q contained SOX certifications signed by Defendants Bedrosian and Galvan.

**August 28, 2017 Form 10-K**

154.    On August 28, 2017 the Company filed with the SEC its annual report for the fiscal year ended June 30, 2017 on a Form 10-K (the "2017 10-K"), which was signed by Defendants Bedrosian, Galvan, Farber, Drabik, Taveira, Maher, Paonessa, and LePore, and non-party Landis.

155.    The 2017 10-K described the competitive nature of the industry, stating in relevant part:

> We are focused on increasing our market share in the generic pharmaceutical industry while concentrating additional resources on the development of new products, with an emphasis on controlled substance products. We continue to improve our financial performance by expanding our line of generic products, increasing unit sales to current customers, creating manufacturing efficiencies and managing our overhead and administrative costs.
>
> * * *
>
> **Competition**
> The manufacturing and distribution of generic pharmaceutical products is a highly competitive industry. Competition is based primarily on price. In addition to competitive pricing, our competitive advantages are our ability to provide strong and dependable customer service by maintaining adequate inventory levels, employing a responsive order filling system and prioritizing timely fulfillment of orders. We ensure that our products are available from national wholesale, chain drug and mail-order suppliers as well as our own warehouse. The modernization of our facilities, hiring of experienced staff and implementation of inventory and quality control programs have improved our competitive cost position. We compete with other manufacturers and marketers of generic and brand-name drugs. Each product manufactured and/or sold by us has a different set of competitors.
>
> * * *
>
> The generic pharmaceutical industry is highly competitive. We face strong competition in our generic product business. Revenues and gross profit derived from the sales of generic pharmaceutical products tend to follow a pattern based on certain regulatory and competitive factors. As patents for brand-name products and related exclusivity periods expire or fall under patent challenges, the first generic manufacturer to receive regulatory approval for generic equivalents of such products is generally able to achieve significant market penetration. As competing off-patent manufacturers receive regulatory approvals on similar products or as brand manufacturers launch generic versions of such products (for which no separate regulatory approval is required), market share, revenues and gross profit typically decline, in some cases dramatically. Accordingly, the level of market share, revenue and gross profit attributable to a particular generic product is normally related to the number of competitors in that product's market and the timing of that product's regulatory approval and launch, in relation to competing

approvals and launches. Consequently, we must continue to develop and introduce new products in a timely and cost effective manner to maintain our revenues and gross margins.

156.    Attached to the 2017 10-K were SOX certifications signed by Defendants Bedrosian and Galvan attesting to the accuracy of the 2017 10-K.

157.    The statements in ¶¶ 113-118, 124-130, 136-144, and 150-156, were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose *inter alia*: (1) Lannett was a participant in the Anti-Competitive Misconduct; (2) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (3) the Company lacked internal controls over the its pricing procedures for at least five of its drug products; (4) Lannett was at risk for regulatory investigation and enforcement that would negatively impact the Company; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements during the First Relevant Period were materially false and misleading.

### The Truth Emerges as to the Anti-Competitive Misconduct

158.    During the First Relevant Period, the Individual Defendants made and/or caused the Company to issue false and misleading statements and omissions regarding 1) the Company's aggressive prices being the result of increased market competition as opposed to the Anti-Competitive Misconduct 2) the Company's own compliance with state and federal laws 3) the Company's internal controls over its pricing strategies and 4) the risk posed to the Company itself from the regulatory and antitrust actions stemming from the Anti-Competitive Misconduct. Throughout the relevant period, the Defendants adamantly assured investors and the public that Lannett was not involved in the Anti-Competitive Misconduct, and that the Company's financial

results were the product of Lannett's and its competitors' aggressive competition in the market. However, the Individual Defendants failed to disclose that the Company was engaged in the Anti-Competitive Misconduct, the Company's growth and financial results were not the result of a competitive market or the Company's strong leadership, and that the Company lacked internal controls over its pricing of certain drug products.

159.     On October 31, 2017, Lannett's ruse came to an end when the Company was named as a defendant in the AG Action. As the details behind the Anti-Competitive Misconduct and Lannett's participation in the scheme came to light, the Company's share price fell $3.25 over the course of the trading day, around 14%, from opening at $23.15 per share on October 31, 2017, to close at $19.90 the same day.

### False and Misleading Statements as to the Distribution Agreement

#### *February 8, 2018 10-Q and Earnings Call*

160.     On February 8, 2018, the Company held an earnings call for analysts and investors to discuss Lannett's second quarter results for the fiscal year ended June 30, 2018. During the call, Defendant Crew discussed the Distribution Agreement and the Company's relationship with JSP in light of Defendant Bedrosian's departure. Defendant Crew stated in relevant part, "I'm pleased to say that Arthur Bedrosian our former CEO has agreed to a strategic advisory role of the company. He will be focused on transitioning and strengthening our relationships with our key alliance partners of JSP and HTC among others. I'm happy to have him on board and look forward to continue to work together."

161.     In response to a question by an analyst on renewing the Distribution Agreement, Defendant Crew stated during the call:

Let me start with the JSP licensure first. Obviously it's a critical important relation we look forward to expanding that relationship overtime. We obviously have a very long mutually beneficial relationship with the JSP, they are a significant shareholder and

would be happy to add that to their share base. I'm optimistic, because of the number of things we have going on between the two companies that there is a big need for us to continue to partner as we have in the past. Please note as we've announced earlier and I noted in my remarks, we have retained Arthur to facilitate and guide exactly such transactions and conversations and transitions and look forward to doing that with them. The timeline of these sorts of transactions have their own pacing. But it's clearly a priority and we're optimistic that well come to a good position in a relatively not-too-distant future.

162.     After receiving an additional question regarding Lannett's relationship with JSP,

Defendant Crew stated:

Again on — there's two parties in the negotiation, we're going to have that conversation with them in terms of things that matter to them and things that matter to us. I want to stress that we- it's a long-term relationship with a lot of moving parts, shareholder relationships, share repurchase opportunities which I think is disclosed in all of our documents and again working with Arthur to find the way that makes sense for them and us in the way we move forward, as quickly as possible. So there's a renewal component as it relates to the current contract, but we would sit down with them and find out what are the things that they most care about in order to make the productive conversation, so I won't speculate here on those moving parts but just please trust that that it is an incredibly high priority for us and that we are working with all the folks in the company, before I came and while I am here, to make sure that comes to a great outcome for both parties.

### May 9, 2018 Deutsche Bank Health Care Conference Call

163.     On May 9, 2018, at the Deutsche Bank Health Care Conference, Defendant Crew

discussed the Distribution Agreement and its vital relationship with JSP stating in relevant part:

Looking a bit beyond that, we obviously want to continue to drive our internal pipeline, whether it's externally or internally sourced. Internally, we'll focus again on some of the pain management opportunities and solutions where we have some distinctive capabilities. And on the external side, be more thoughtful about technologies and specialized capabilities to bring into our portfolio. And last but not least, and as you've seen if you've been tracking the company of late, we do want to continue to leverage our mid-market position where we see the generic as a big blue ocean of opportunity that is providing many opportunities first to our business, and position ourself as a partner of choice for these companies. A number of other suppliers, you see them on the right side of the slide have --they're believing in that positioning and bringing their products to us. Everything from long-standing partnerships with Jerome Stevens, the basis of our levothyroxine product as well as new partners from Aralez to Sciecure to Cerovene and Dexcel and others. And we look forward to their contributions to our revenues as we move forward.

164.    In response to a question on the durability of one of the Company's products and for clarification on the future of the Lannett-JSP relationship, Defendant Crew responded by stating:

So I think I alluded in every company has its concerns and issues. What Gregg is referring to here is our contract with this long-term partnership JSP. It does have a technical expiration date of March of next year. And I think some of the concerns for our company and the valuations you see is about the persistency of that contract. While again, I'm very careful not to indicate what another party will do, our partners at Jerome Stevens are proud, bright and capable businessmen, and they don't need me to speak for them relative to their exact intentions. And I wouldn't presume to do so. However, I would note that they're one of our largest shareholdings with the company and they are businessmen that are closely watching the sort of changes we're making to the business, and I believe applaud it. And as a result, I'm confident when their time is ready, we'll get to that renewal.

165.    The statements in ¶¶ 160-164 were materially false and misleading, and they failed to disclose material facts necessary to make the statements made not false and misleading. Specifically, the Individual Defendants improperly failed to disclose, *inter alia*, that: (1) JSP did not have a vested interest in the Company; (2) the Distribution Agreement and relationship with JSP would not likely continue; and (3) the company failed to maintain internal controls. As a result of the foregoing, the Company's public statements during the Second Relevant Period were materially false and misleading.

## The Truth Emerges as to the Distribution Agreement

166.    On August 20, 2018, before the market opened, the Company issued a press release filed on a Form 8-K with the SEC announcing that the Distribution Agreement, which was set to expire on March 23, 2019, would not be renewed. The press release stated in relevant part:

Lannett Company, Inc, today said that its distribution agreement with Jerome Stevens Pharmaceuticals (JSP), which expires on March 23, 2019, will not be renewed. "The Steinlauf family advised us this past Friday evening that they will not renew our agreement to distribute three JSP products: Butalbital, Aspirin, Caffeine with Codeine Phosphate Capsules USP, Digoxin Tablets USP and Levothyroxine Sodium Tablets USP, upon its expiration in March 2019," said Tim Crew, chief executive officer of

Lannett. "The family has assured us of a continuous supply of the products through March of next year. These products remain valuable assets for us and are expected to significantly contribute to our financial performance in fiscal 2019. "While we are disappointed, and intend to redouble our continuing efforts to explore options for addressing our capital structure, we have been preparing for this contingency, knowing that this outcome was a possibility. Accordingly, we have been focused on improving our already strong base commercial business of more than 100 currently marketed products. Since the beginning of this year, we added new products to our offering and expanded our customer base. We continued to streamline our operations. Specifically, we successfully launched eight new products in the first seven months of calendar 2018, which we estimate will add net sales in excess of $50 million in fiscal 2019, and in addition to our launches, we completed several transactions to add more than 25 market-ready or near-market-ready product lines to our pipeline. Importantly, we continue to make excellent progress advancing other previously approved products toward launch and plan to commence marketing a substantial number of them in the coming months and throughout fiscal 2019. "In addition, in our current fiscal year, we have already submitted four drug applications associated with two product families, implemented a restructuring plan at our Cody Laboratories subsidiary and streamlined our product distribution function. "Looking ahead, our team is actively evaluating a number of additional potential transactions to add even more products to our portfolio to grow revenues and profits, and diversify our business. We have more than 20 owned and partnered drug product applications currently pending at the FDA, and anticipate a significant number of product approvals in fiscal 2019. We also expect to expand restructuring initiatives to further reduce expenditures. Finally, we are evaluating the impact of this contract ending in March 2019 on our goodwill."

167. Defendant Crew's attempt to soften the revelation was ineffective, and upon news that the Distribution Agreement would not be renewed, the price per share of Lannett stock fell from the previous trading session by $8.15, or 60%, from a closing price of $13.50 per share on August 17, 2018, to close at $5.35 on August 20, 2018.

### The Truth Continues to Emerge

168. On May 7, 2019, the Company filed its quarterly report for the period ended March 31, 2019 (the "May 2019 10-Q"). The May 2019 10-Q disclosed that the Company had received written notice from a number of state Attorneys General (the "AGs") of impending claims the AGs intend to bring against Lannett. Specifically, the 10-Q stated in relevant part:

On May 1, 2019, the Company and one of its employees, along with other generic pharmaceutical manufacturers, received written notice from various state

Attorneys General that they intend to bring claims alleging price fixing and anti-competitive behavior with respect to additional drug products, some of which are manufactured and distributed by the Company. . . . The Company does not know when such claims will be filed, what allegations will be made against the Company or any of its employees or other affiliated individuals, or whether allegations against the Company will be related to any of the additional drug products identified in the notice.

## DAMAGES TO LANNETT

169.    As a direct and proximate result of the Individual Defendants' conduct, Lannett has lost and expended, and will lose and expend, many millions of dollars.

170.    Such losses include those incurred due to the Anti-Competitive Misconduct.

171.    Such expenditures include, but are not limited to, legal fees and payments associated with the Securities Class Actions, the AG Action, the Antitrust Action, and other lawsuits filed against the Company, as well as investigations of the Company, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

172.    Such losses include, but are not limited to, excessive compensation and benefits paid to the Individual Defendants who breached their fiduciary duties to the Company, including bonuses tied to the Company's attainment of certain objectives.

173.    As a direct and proximate result of the Individual Defendants' conduct, Lannett has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations and the Individual Defendants' breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE ALLEGATIONS

174.    Plaintiff brings this action derivatively and for the benefit of Lannett to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their

fiduciary duties as directors and/or officers of Lannett, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act, as well as the aiding and abetting thereof.

175.    Lannett is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

176.    Plaintiff is a current shareholder of Lannett and has continuously held Lannett common stock during all relevant times. Plaintiff will adequately and fairly represent the interests of Lannett in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY ALLEGATIONS

177.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

178.    A pre-suit demand on the Board of Lannett is futile and, therefore, excused. At the time of filing of this action, the Board consists of the following seven individuals: Defendants Crew, Drabik, Farber, LePore, Paonessa, and Taveira (the "Director-Defendants"), and non-party John C. Chapman (together with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to four of the seven Directors who are on the Board at the time this action is commenced.

179.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the scheme they engaged in knowingly or recklessly to make and/or cause the Company to make false and misleading statements and omissions of material facts, while three of them engaged in insider sales based on material non-public information, netting proceeds of over $3 million, which renders them

unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the scheme.

180.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly participated in causing the Company to engage in the Anti-Competitive Misconduct and in making and/or causing the Company to make the materially false and misleading statements alleged herein. The fraudulent scheme was, *inter alia*, intended to make the Company appear more profitable and attractive to investors. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

181.    Additional reasons that demand on Defendant Crew is futile follow. Defendant Crew has served as the Company's CEO since January 2018.  He also serves as a member of the Board. Thus, as the Company admits, he is a non-independent director. The Company provides Defendant Crew with his principal occupation, and he receives handsome compensation, including $1,329,781 during the fiscal year ended June 30, 2018. Defendant Crew was ultimately responsible for all of the false and misleading statements and omissions that were made in the Second Relevant Period. As the Company's highest officer and as a trusted Company director, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Moreover, Defendant Crew is a defendant in the Second Class Action, which survived a motion to dismiss. For these reasons, too, Defendant Crew breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

182.    Additional reasons that demand on Defendant Drabik is futile follow. Defendant Drabik has served as a Company director since January 2011. He also serves as a member of the Audit Committee, Compensation Committee, Strategic Planning Committee, and as Chairman of the Governance and Nominating Committee. Defendant Drabik receives handsome compensation, including $266,006 during the fiscal year ended June 30, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Drabik signed, and thus personally made the false and misleading statements in the 2014 10-K, the 2015 10-K, the 2016 10-K and the 2017 10-K. His insider sale before the fraud was exposed, which yielded at least $769,375 in proceeds, demonstrates his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Drabik breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

183.    Additional reasons that demand on Defendant Farber is futile follow. Defendant Farber has served as a Company director since May 2006. He also serves as a member of Strategic Planning Committee. Defendant Farber initially joined the Company in August 2003 as Secretary. Defendant Farber receives handsome compensation, including $247,006 during the fiscal year ended June 30, 2018. As a long-time Company director he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his

duties to protect corporate assets. Defendant Farber signed, and thus personally made the false and misleading statements in the 2014 10-K, the 2015 10-K, the 2016 10-K and the 2017 10-K. His insider sales before the fraud was exposed, which yielded at least $2 million in proceeds, demonstrate his motive in facilitating and participating in the fraud.  For these reasons, too, Defendant Farber breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

184.    Additional reasons that demand on Defendant LePore is futile follow. Defendant LePore has served as a Company director since July 2017 and as Chairman of the Board since July 2018. He also serves as a member of the Governance and Nominating Committee and the Strategic Planning Committee. Defendant LePore receives handsome compensation, including $129,785 during the fiscal year ended June 30, 2018. As a Company director and Chairman of the Board, he conducted little, if any, oversight of the Company's engagement in the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant LePore signed, and thus personally made the false and misleading statements in the 2017 10-K. For these reasons, too, Defendant LePore breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

185.    Additional reasons that demand on Defendant Paonessa is futile follow. Defendant Paonessa has served as a Company director since July 2015. He also serves as Chairman of the Strategic Planning Committee. Defendant Paonessa receives handsome compensation, including $248,006 during the fiscal year ended June 30, 2018. As a Company director he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive

Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Paonessa signed, and thus personally made the false and misleading statements in the 2016 10-K and the 2017 10-K. For these reasons, too, Defendant Paonessa breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

186.   Additional reasons that demand on Defendant Taveira is futile follow. Defendant Taveira has served as a Company director since May 2012. He also serves as a member of the Audit Committee, the Governance and Nominating Committee, and as Chairman of the Compensation Committee. Defendant Taveira receives handsome compensation, including $240,006 during the fiscal year ended June 30, 2018. As a long-time Company director and member of the Audit Committee, he conducted little, if any, oversight of the Company's engagement in the scheme to engage in the Anti-Competitive Misconduct and the scheme to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Furthermore, Defendant Traveira signed, and thus personally made the false and misleading statements in the 2014 10-K, the 2015 10-K, the 2016 10-K and the 2017 10-K His insider sales before the fraud was exposed, which yielded at least $204,615 in proceeds, demonstrate his motive in facilitating and participating in the fraud. For these reasons, too, Defendant Taveira breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

187.   Additional reasons that demand on the Board is futile follow.

188.    Demand in this case is excused because the Director-Defendants control the Company and are beholden to each other. The Director-Defendants have longstanding business and personal relationships with each other and the other Individual Defendants that preclude them from acting independently and in the best interests of the Company and the shareholders. For example, Defendant Farber is the owner of Auburn and Defendant Paonessa is the CEO of KeySource, two generic distributors that Lannett has relied on and benefited from for a number of years. During the fiscal years ended June 30, 2018 and 2017, the Company attributed net sales of $1.9 million and $1.7 million to KeySource; during the fiscal years ended June 30, 2018, 2017, and 2016, the Company attributed net sales of $3.9 million, $3.7 million and $3.1 million, respectively, to Auburn.  These conflicts of interest precluded the Director-Defendants from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, any demand on the Director-Defendants would be futile.

189.    Additionally, the Director-Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and should have ensured that the Company maintained adequate oversight and internal controls over its disclosures and pricing strategies to prevent the Company's participation in the Anti-Competitive Misconduct. Thus, the Directors breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

190.    In violation of the Code of Conduct, the Director-Defendants conducted little, if any, oversight of the Company's internal controls over public reporting and of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public, and facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, and violations of the Exchange Act. In

violation of the Code of Conduct, the Director-Defendants failed to comply with the law. Thus, the Director-Defendants face a substantial likelihood of liability, and demand is futile as to them.

191.    Lannett has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Lannett any part of the damages Lannett suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

192.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

193.    The acts complained of herein constitute violations of fiduciary duties owed by Lannett officers and directors, and these acts are incapable of ratification.

194.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of Lannett. If there is a directors' and officers' liability insurance policy covering the Directors, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter*

*alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of Lannett, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

195.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause Lannett to sue the Individual Defendants named herein, as, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

196.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Directors, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## FIRST CLAIM

### Against Individual Defendants for Violations of
### Section 14(a) of the Exchange Act

197.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

198.    The Section 14(a) Exchange Act claims alleged herein are based solely on negligence. They are not based on any allegation of reckless or knowing conduct by or on behalf of the Individual Defendants. The Section 14(a) claims alleged herein do not allege and do not sound in fraud. Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these nonfraud claims.

199.    Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a)(1), provides that "[i]t shall be unlawful for any person, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 12 of this title [15 U.S.C. § 78l]."

200.    Rule 14a-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9.

201.    Under the direction and watch of the directors, the 2014, 2015, and 2016 Proxy Statements (the "Proxy Statements") failed to disclose, *inter alia*: (1) Lannett was a participant in the Anti-Competitive Misconduct; (2) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (3) the Company lacked internal controls over the its pricing procedures for at least five of its drug products; (4) Lannett was at risk for regulatory investigation and enforcement that would negatively impact the Company; and (5) the Company failed to maintain internal controls.

202.    Certain of the Individual Defendants also caused the Proxy Statements to be false and misleading with regard to executive compensation in that they purported to employ "pay-for-performance" elements, designed to "focus [Company] executives on creating long-term shareholder value and directly linking corporate and individual performance goals with the results

of the Company" while failing to disclose that the Company's share price was being artificially inflated by the false and misleading statements made by the Individual Defendants as alleged herein, and therefore any compensation based on the Company's financial performance was artificially inflated.

203.    The Proxy Statements also made references to the Code of Conduct. The Code of Conduct required the Company and the Individual Defendants to abide by relevant laws and regulations, make accurate and non-misleading public disclosures, and not engage in insider trading. By issuing false and misleading statements to the investing public and engaging in insider trading, certain of the Individual Defendants violated the Code of Conduct. The Proxy Statements failed to disclose these violations and also failed to disclose that the Code of Conduct's terms were being violated.

204.    In the exercise of reasonable care, certain of the Individual Defendants should have known that by misrepresenting or failing to disclose the foregoing material facts, the statements contained in the Proxy Statements were materially false and misleading. The misrepresentations and omissions were material to Plaintiff in voting on the matters set forth for shareholder determination in the Proxy Statements, including, but not limited to, election of directors, ratification of an independent auditor, and the approval of executive compensation.

205.    The false and misleading elements of the Proxy Statements led to the re-election of Defendants Bedrosian, Farber, Drabik, Taveira, Maher, and Paonessa, which allowed them to continue breaching their fiduciary duties to Lannett.

206.    The Company was damaged as a result of the Individual Defendants' material misrepresentations and omissions in the Proxy Statements.

207.    Plaintiff on behalf of Lannett has no adequate remedy at law.

## SECOND CLAIM

### Against Individual Defendants for Breach of Fiduciary Duties

208.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

209.    Each Individual Defendant owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Lannett's business and affairs.

210.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

211.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Lannett.

212.    In breach of their fiduciary duties, the Individual Defendants knowingly or recklessly caused the Company to engage in the Anti-Competitive Misconduct.

213.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

214.    In further breach of their fiduciary duties owed to Edison, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) Lannett was a participant in the Anti-Competitive Misconduct; (2) the Company's financial results and growth were not the product of a competitive market or the Company's strong leadership; (3) the Company lacked internal controls over the its pricing procedures for at least five of its drug products; (4) Lannett was at risk for regulatory investigation and enforcement that would negatively impact the

Company; and (5) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements during the First Relevant Period were materially false and misleading.

215.    The Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) JSP did not have a vested interest in the Company; (2) the Distribution Agreement and relationship with JSP would not likely continue; and (3) the company failed to maintain internal controls.  As a result of the foregoing, the Company's public statements during the Second Relevant Period were materially false and misleading.

216.    The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

217.    In breach of their fiduciary duties, five of the Individual Defendants engaged in lucrative insider sales while the price of the Company's common stock was artificially inflated due to the false and misleading statements of material fact discussed herein.

218.    The Individual Defendants had actual or constructive knowledge that the Company issued materially false and misleading statements, and they failed to correct the Company's public statements. The Individual Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and omissions were committed knowingly or recklessly and for

the purpose and effect of artificially inflating the price of the Company's securities and disguising insider sales.

219.     The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

220.     These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

221.     As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Lannett has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

222.     Plaintiff on behalf of Lannett has no adequate remedy at law.

## THIRD CLAIM

### Against Individual Defendants for Unjust Enrichment

223.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

224.     By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, Lannett.

225.     The Individual Defendants either benefitted financially from the improper conduct, and their making lucrative insider sales or received unjustly lucrative bonuses tied to the false and misleading statements, or received bonuses, stock options, or similar compensation from Lannett that was tied to the performance or artificially inflated valuation of Lannett, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

226.     Plaintiff, as a shareholder and a representative of Lannett, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits—including from insider sales, benefits, and other compensation, including any performance-based or valuation-based compensation—obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary duties.

227.     Plaintiff on behalf of Lannett has no adequate remedy at law.

## FOURTH CLAIM

### Against Individual Defendants for Waste of Corporate Assets

228.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

229.     As a further result of the foregoing, the Company will incur many millions of dollars of legal liability and costs to defend unlawful actions, to engage in internal investigations, and to lose financing from investors and business from future customers who no longer trust the Company and its products.

230.     As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

68

231.    Plaintiff on behalf of Lannett has no adequate remedy at law.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of Lannett, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Lannett;

(c)    Determining and awarding to Lannett the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing Lannett and the Individual Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Lannett and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of Lannett to nominate at least four candidates for election to the Board; and

3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

(e)     Awarding Lannett restitution from the Individual Defendants, and each of them;

(f)     Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

(g)     Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: May 13, 2019                                          Respectfully submitted,

Of Counsel:                                                  **FARNAN LLP**

Phillip Kim                                                  /s/ Michael J. Farnan
**THE ROSEN LAW FIRM, P.A.**                                Brian E. Farnan (Bar No. 4089)
275 Madison Avenue, 34th Floor                              Michael J. Farnan (Bar No. 5165)
New York, NY 10016                                          919 N. Market St., 12th Floor
Telephone: (212) 686-1060                                   Wilmington, DE 19801
Facsimile: (212) 202-3827                                   Telephone: (302) 777-0300
Email: pkim@rosenlegal.com                                  Facsimile: (302) 777-0301
                                                            bfarnan@farnanlaw.com
Timothy Brown                                               mfarnan@farnanlaw.com
**THE BROWN LAW FIRM, P.C.**
240 Townsend Square
Oyster Bay, NY 11771
Tel: (516) 922-5427
Fax: (516) 344-6204
Email: tbrown@thebrownlawfirm.net

                                                            *Attorneys for the Plaintiff*