**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| IN RE LANNETT COMPANY, INC. DERIVATIVE LITIGATION | Lead Case No. 19-cv-888-MN-JLH |

**BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR
<u>FINAL APPROVAL OF SETTLEMENT</u>**

<div style="display:flex">

**FARNAN LLP**
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile:  (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Liaison Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016
Telephone: (212) 686-1060
Facsimile:  (212) 202-3827
pkim@rosenlegal.com

*Co-Lead Counsel for Plaintiffs*


**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile:  (860) 537-4432
gjohnson@scott-scott.com

**SCOTT+SCOTT
ATTORNEYS AT LAW LLP**
Scott R. Jacobsen
Jonathan M. Zimmerman
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
sjacobsen@scott-scott.com
jzimmerman@scott-scott.com

*Co-Lead Counsel for Plaintiffs*

</div>

Dated:  September 16, 2020

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................ 1

II.     BACKGROUND ......................................................................................................... 3

        A.      Factual and Procedural History.......................................................................... 3

        B.      Settlement Efforts, Preliminary Approval, and Stockholder Notice...................... 5

III.    THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE ............................ 7

        A.      The Benefits Achieved Through the Settlement...................................................... 7

                1.      New and/or Newly Robust Corporate Policies ........................................... 8

                2.      New Independent Director and Improved Board Training ......................... 8

                3.      Enhanced Audit Committee Charter ........................................................... 9

                4.      Employee Compliance and Whistleblower Policy ..................................... 9

        B.      The Risks of Establishing Liability and Damages................................................. 9

        C.      The Complexity, Expense, and Likely Duration of Continued Litigation........... 12

        D.      The Stage of the Proceedings and Discovery ..................................................... 13

IV.     THE AGREED-UPON FEE AND EXPENSE AWARD IS REASONABLE AND
        SHOULD BE APPROVED ....................................................................................... 14

        A.      Applicable Legal Standards ............................................................................. 14

        B.      The Settlement Confers Substantial Benefits on Lannett .................................... 15

                1.      The Agreed-Upon Fee and Expense Award is in Line with  (or
                        Less than) Fee and Expense Awards in Comparable Cases .................... 16

        C.      The Efforts of Plaintiffs' Counsel and the Standing and Ability of Counsel ....... 18

        D.      The Contingent Nature of the Fee Supports the Requested Fee Award .............. 19

        E.      The Plaintiffs' Service Award Should Be Approved............................................ 20

## TABLE OF AUTHORITIES

<div align="right">PAGE(S)</div>

CASES

*Ams. Mining Corp. v. Theriault*,
  51 A.3d 1213 (Del. 2012) ...................................................................................15

*Barton v. Clancy*,
  632 F.3d 9 (1st Cir. 2011) ..................................................................................14

*Bell Atlantic Corp. v. Bolger*,
  2 F.3d 1304 (3d Cir. 1993)....................................................................................7

*Berkey Photo, Inc. v. Eastman Kodak Co.*,
  603 F.2d 263 (2d Cir. 1979)................................................................................11

*Cohn v. Nelson*,
  375 F. Supp. 2d 844 (E.D. Mo. 2005)..................................................................15

*Dow Jones & Co. v. Shields*,
  1992 WL 44907 (Del. Ch. Jan. 10, 1992) ............................................................15

*Girsh v. Jepson*,
  521 F.2d 153 (3d. Cir. 1975)......................................................................7, 12, 13

*Hensley v. Eckerhart*,
  461 U.S. 424 (1983)............................................................................................14

*In re Abercrombie & Fitch Co. S'holders Derivative Litig.*,
  886 A.2d 1271 (Del. 2005) ..............................................................................3, 18

*In re AXA Fin., Inc. S'holders Litig.*,
  2002 WL 1283674 (Del. Ch. May 22, 2002)...................................................15, 19

*In re Caremark Int'l Inc. Derivative Litig.*,
  698 A.2d 959 (Del. Ch. 1996).............................................................................19

*In re Cendant Corp., Derivative Action Litig.*,
  232 F. Supp. 2d 327 (D.N.J. 2002) .....................................................................20

*In re Cendant Corp. Litig.*,
  264 F.3d 201 (3d Cir. 2001).................................................................................10

*In re Davita Healthcare Partners, Inc.*,
  2015 WL 3582265 (D. Colo. June 5, 2015).........................................................17

*In re Del Monte Foods Co. S'holders Litig.*,
   2011 WL 2535256 (Del. Ch. June 27, 2011) ........................................................18

*In re Dr. Pepper/Seven Up Cos., S'holders Litig.*,
   1996 WL 74214 (Del. Ch. Feb. 9, 1996) .............................................................15

*In re First Interstate Bancorp Consol. S'holder Litig.*,
   756 A.2d 353 (Del. Ch. 1999).............................................................................20

*In re Golden State Bancorp Inc. S'holders Litig.*,
   2000 WL 62964 (Del. Ch. Jan. 7, 2000) ........................................................15, 20

*In re Hewlett-Packard Co. S'holder Derivative Litig.*,
   2015 WL 4605786 (N.D. Cal. July 30, 2015) ......................................................17

*In re Johnson & Johnson Deriv. Litig.*,
   900 F. Supp. 2d 467 (D.N.J. 2012) ...................................................................7, 13

*In re Lear Corp. S'holder Litig.*,
   967 A.2d 640 (Del. Ch. 2008).............................................................................11

*In re Lloyd's Am. Tr. Fund Litig.*,
   2002 WL 31663577 (S.D.N.Y. Nov. 26, 2002), *aff'd sub nom, Adams v. Rose*,
   2003 WL 21982207 (2d Cir. Aug. 20, 2003).........................................................11

*In re Oracle Secs. Litig.*,
   852 F. Supp. 1437 (N.D. Cal. 1994) ....................................................................15

*In re OSI Sys., Inc. Derivative Litig.*,
   2017 WL 5642304 (C.D. Cal. May 2, 2017) ........................................................17

*In re Pacific Enters. Secs. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ................................................................................19

*In re Plains Res. Inc. S'holders Litig.*,
   2005 WL 332811 (Del. Ch. Feb. 4, 2005) ...........................................................20

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) .........................................................................13

*In re Sauer-Danfoss Inc. S'holders Litig.*,
   65 A.3d 1116 (Del. Ch. 2011)..............................................................................18

*In re Walt Disney Co. Derivative Litig.*,
   907 A.2d 693 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006)...............................11

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004).................................................................................12

*Kamen v. Kemper Fin. Servs.*,
    500 U.S. 90 (1991) ........................................................................................10

*Merola v. Atlantic Richfield Co.*,
    515 F.2d 1 65, 169-70 (3d Cir. 1975) ...............................................16, 17

*Mills v. Elec. Auto-Lite Co.*,
    396 U.S. 375 (1970) ..................................................................................7, 14

*Neponsit Inv. Co. v. Abramson*,
    405 A.2d 97 (Del. 1979) ..............................................................................13

*Nitsche v. Temple*,
    No. 12636-VCG (Del. Ch. May 26, 2017) ...............................................20

*Pearson v. Vogelsinger*,
    No 028- VCG (Del. Ch. Nov. 27, 2006) ....................................................20

*Rubery v. Kleinfeld*,
    ECF No. 53 (W.D. Pa. Jan. 20, 2015) ......................................................17

*Ryan v. Gifford*,
    2009 WL 18143 (Del. Ch. Jan. 2, 2009) ...............................16, 19, 20

*San Antonio Fire & Police Pension Fund v. Bradbury*,
    2010 WL 4273171 (Del. Ch. Oct. 28, 2010) ...............................16, 19

*Shlensky v. Dorsey*,
    574 F.2d 131 (3d. Cir. 1978) ................................................................7, 15

*Sugarland Indus., Inc. v. Thomas*,
    420 A.2d 142 (Del. 1980) ............................................................................15

*TBK Partners, Ltd v. W. Union Corp.*,
    675 F.2d 456 (2d Cir. 1982) ......................................................................12

*Unite Nat'l Ret. Fund v. Watts*,
    2005 WL 2877899 (D.N.J. Oct. 28, 2005) ...............................7, 10, 13

*Vinh Du v. Blackford*,
    2018 WL 6604484 (D. Del. Dec. 17, 2018) ...........................................12

## STATUTES, RULES & REGULATIONS

8 DELAWARE CODE
    §220 ........................................................................................................4, 20

Fᴇᴅ. R. Cɪᴠ. P.
    23.1...................................................................................................................................5
    12(b)(6) ..........................................................................................................................5

Sᴇᴄᴜʀɪᴛɪᴇs Exᴄʜᴀɴɢᴇ Aᴄᴛ ᴏғ 1934
    §14(a) .........................................................................................................................3, 4

## I.       INTRODUCTION

Co-Lead Plaintiffs Drew Dozier ("Plaintiff Dozier") and John J. Conrad ("Plaintiff Conrad") (collectively, "Plaintiffs") in the above-captioned action (the "Derivative Action") respectfully submit this Brief in support of Plaintiffs' Motion for Final Approval of Settlement (the "Motion").[1]   After much effort on behalf of Lannett Company, Inc. ("Lannett" or the "Company"), the Parties reached an agreement that settles the Derivative Action (the "Settlement"), as set forth in the Stipulation. Plaintiffs brought this Derivative Action on behalf of Lannett against certain Company officers and/or members of Lannett's Board of Directors (the "Board"), alleging breaches of fiduciary duties, violations of the federal securities laws, and other misconduct, including knowingly or recklessly causing the Company to participate in anti-competitive conduct, making and/or causing the Company to make false and misleading statements to the public, and failing to maintain internal controls.

After more than a year of significant efforts by Plaintiffs and their counsel to remediate the alleged breaches of fiduciary duties at Lannett, the Parties reached a Settlement that they agree is fair, reasonable, adequate, and confers substantial benefits upon Lannett and its stockholders. Plaintiffs' efforts on behalf of Lannett included, *inter alia*: (1) serving Lannett's Board with a stockholder books and records demand by Plaintiff Conrad; (2) the review of Lannett's Board meeting minutes and related Board-level materials; (3) several months of contentious arms-length settlement negotiations with the Defendants; (4) a full-day mediation session with mediator Gregory P. Lindstrom of Phillips ADR (the "Mediator"); and (5) working to achieve Lannett's

---

[1]       Unless otherwise defined herein, all capitalized terms have the same meaning as those set forth in the Stipulation and Agreement of Settlement, dated May 22, 2020 (the "Stipulation" or "Stip.") and attached as Exhibit 1 to Plaintiffs' Unopposed Motion for Preliminary Approval of Settlement (D.I. 37, 37-1).

agreement to significantly bolster the Company's internal controls and oversight for its compliance function and practices.

The Settlement requires Lannett to implement comprehensive and salutary corporate governance enhancements and reforms (the "Reforms") and maintain these Reforms for a period of at least three years. *See* Stip., Exhibit A. These policies are intended to specifically address the alleged weaknesses in internal controls over public reporting and compliance with antitrust rules and regulations that Plaintiffs contend led to the wrongdoing claimed in the Derivative Action. Plaintiffs were able to negotiate and obtain an agreement from the Company to adopt these Reforms despite facing real risks with respect to establishing demand futility, liability, and damages. Lannett acknowledges and agrees that the filing, pendency, and settlement of the Derivative Action were precipitating and material factors in Lannett's decision to adopt and implement the Reforms. Lannett further acknowledges and agrees that the Reforms confer a substantial benefit upon Lannett and its stockholders. Stip., §IV, ¶2.1. In addition, the independent directors of the Board, in exercising their business judgment, approved the Settlement and each of its terms, as set forth in the Stipulation, as in the best interest of Lannett. *See* Stip., §I.

In light of the substantial benefits that the Settlement confers upon Lannett and Lannett stockholders due to the Reforms, Defendants agreed to pay, or cause their insurer to pay, $600,000 to Plaintiffs' Counsel for their attorneys' fees and expenses (the "Fee and Expense Award"). Stip., §IV, ¶5.1. The Parties agree that the Fee and Expense Award is fair and reasonable. *Id*. Importantly, the Fee and Expense Award is the result of a double-blind Mediator's proposal, negotiated at arm's-length and with substantial assistance from the Mediator, only after the parties

agreed to the material terms of the Settlement.[2]  Plaintiffs also seek a modest $1,500 service award for each Plaintiff for the time and effort that Plaintiffs contributed to the case, which will be paid out of the Fee and Expense Award.  For these reasons, and, as more fully detailed herein, this Motion should be granted in its entirety.

## II.      BACKGROUND

### A.      Factual and Procedural History

Lannett is a Delaware corporation with principal executive offices located in Philadelphia, Pennsylvania.  Plaintiffs allege in the Derivative Action that the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing the Company to participate in anti-competitive misconduct, by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and compliance, and by causing the Company to fail to maintain internal controls.  On May 13, 2019, Plaintiff Dozier filed a verified stockholder action derivatively on behalf of Lannett, captioned *Dozier v. Bedrosian*, No. 1:19-cv-00888 (the "*Dozier* Action"), against the Individual Defendants alleging violation of §14(a) of the Securities Exchange Act of 1934, breach of fiduciary duties, unjust enrichment, and waste of corporate assets.  (*Dozier* Action, D.I. 1).  Thereafter, between August 21 and September 26, 2019, the Parties to the *Dozier* Action

---

[2]      The agreed-upon Fee and Expense Award is well within the range of awards in similar cases and would result in Plaintiffs' Counsel earning a very modest .63 multiplier on a total lodestar of $901,922.50 and expenses of $28,270.17.  *See* Declaration of Geoffrey M. Johnson in Support of Plaintiffs' Motion for Final Approval of Settlement and Approval of Agreed-Upon Attorneys' Fees and Expenses ("Johnson Decl."), ¶¶3-5; Declaration of Tim Brown in Support of Plaintiffs' Motion ("Brown Decl."), ¶7; Declaration of Phil Kim in Support of Plaintiffs' Motion ("Kim Decl."), ¶6; Declaration of Brian Farnan in Support of Plaintiffs' Motion ("Farnan Decl."), ¶5.  *See, e.g., In re Abercrombie & Fitch Co. S'holders Derivative Litig*., 886 A.2d 1271, 1273 (Del. 2005) (affirming fee award equal to 2.39 times lodestar, which the court had characterized as "'well within the range of reasonableness for this kind of litigation").

stipulated to revise and extend the briefing schedule to answer the complaint and/or submit potential motions to dismiss, which the Court so ordered.  (*Id.*, D.I. 14, 16-17).

On June 18, 2019, Plaintiff Conrad sent a demand to inspect certain books and records of the Company pursuant to 8 *Del. C.* §220 to investigate potential wrongdoing, mismanagement, and breaches of fiduciary duty by the members of the Company's management and the Board (the "Conrad Demand").  On July 1, 2019, Plaintiff Conrad and Lannett entered into a Confidentiality and Non-Disclosure Agreement (the "Conrad NDA") to allow for the inspection of certain confidential inspection material, which was thereby provided to Plaintiff Conrad.  On July 22, 2019, consistent with the Conrad NDA, Plaintiff Conrad filed a motion to seal a stockholder derivative complaint incorporating the materials Plaintiff Conrad obtained through the Conrad Demand in the Eastern District of Pennsylvania, captioned *Conrad v. Bedrosian*, No. 2:19-cv-03197 (the "*Conrad* Action").  Plaintiff Conrad filed a sealed copy of his complaint on August 1, 2019.  On August 20, 2019, the Court granted Plaintiff Conrad's motion to seal, and on August 21, 2019, Plaintiff Conrad filed a redacted version of his complaint that was available to the public.  (*Conrad* Action, D.I. 10).  On October 8, 2019, Plaintiff Conrad and Lannett submitted a joint stipulation and order to transfer the *Conrad* Action to the District of Delaware to coordinate further proceedings with the *Dozier* Action.  (*Conrad* Action, D.I. 17).  On October 9, 2019, the Honorable Wendy Beetlestone of the Eastern District of Pennsylvania granted the stipulation to transfer.  The *Conrad* Action was subsequently transferred to this Court and captioned *Conrad v. Bedrosian*, No. 1:19-cv-01928.  Pursuant to the stipulation to transfer, Plaintiff Conrad agreed to adhere to the same briefing schedule set by this Court on September 26, 2019, in the *Dozier* Action for purposes of Defendants' motion to dismiss.

On November 13 and November 15, 2019, respectively, Plaintiffs Dozier and Conrad filed identical stipulations extending the time for Defendants to answer or otherwise respond to Plaintiffs' complaints to November 22, 2019, and setting identical briefing schedules for any motions to dismiss the *Dozier* and *Conrad* complaints. (*Dozier* Action, D.I. 18; *Conrad* Action, D.I. 26). Both stipulations were so ordered by the Court. On November 22, 2019, Plaintiffs filed a joint stipulation and proposed order consolidating derivative actions, appointing lead plaintiffs, co-lead counsel, and liaison counsel for plaintiffs, and revising the briefing schedule for a potential motion to dismiss in each of their respective cases. (*Dozier* Action, D.I. 19; *Conrad* Action, D.I. 29). On December 4, 2019, the Court so ordered the joint stipulation.

In compliance with the Order consolidating the actions and appointing lead plaintiffs and co-lead and liaison counsel, on December 6, 2019, Defendants Bedrosian, Crew, Farber, Galvan, Kozlowski, Lepore, Maher, Paonessa, and Lannett filed a motion to dismiss the operative complaint in the consolidated Derivative Action based upon Fed. R. Civ. P. 23.1 and 12(b)(6) and, in the alternative, to stay the Derivative Action. (D.I. 20). That same day, also in compliance with the Court's schedule, Defendants Drabik and Taveira filed a motion to dismiss based upon Fed. R. Civ. P. 23.1. (D.I. 24). Defendants Drabik and Taveira also joined the other Defendants' motion to dismiss. (D.I. 25). Subsequently, on January 24, 2020, the Parties stipulated to extend the briefing schedule on the joinder and motion to dismiss to February 7, 2020, which the Court so ordered on January 27, 2020. (D.I. 27).

### B.      Settlement Efforts, Preliminary Approval, and Stockholder Notice

In early October 2019, the Parties agreed to a private mediation session before the Mediator. In anticipation of the mediation, Plaintiffs' Counsel sent a settlement demand that included an extensive corporate-governance-reforms proposal to Defendants' Counsel on October 18, 2019. The same day, Plaintiffs' and Defendants' Counsel also exchanged mediation statements

and provided copies of the statements to the Mediator.  On October 25, 2019, Plaintiffs' and Defendants' Counsel exchanged replies to the mediation statements, providing copies to the Mediator.  On November 4, 2019, the Parties participated in an in-person full-day mediation to discuss a possible resolution of the Action before the Mediator.  At the mediation, the Parties agreed in principle to the material terms of the Reforms that comprise the consideration for the Settlement.  Following the mediation, with substantial assistance from the Mediator, and only after agreeing-in-principle to the Reforms, the Parties negotiated at arm's-length the attorneys' fees and reimbursement of expenses to be paid to Plaintiffs' Counsel.  On January 14, 2020, the Parties agreed to a double-blind Mediator's proposal provided to the Parties on January 10, 2020, on the amount of attorneys' fees and reimbursement of expenses to be paid to Plaintiffs' Counsel. Defendants agreed to pay, or cause their insurer to pay, the Fee and Expense Award, subject to Court approval, in light of the substantial benefit that will be conferred upon the Company and its stockholders by the Reforms as a result of the Settlement.  Defendants also agreed not to oppose Plaintiffs' request for a Service Award in the amount of $1,500 each, which will come out of the Fee and Expense Award.

On May 22, 2020, Plaintiffs filed their unopposed motion for preliminary approval of the Settlement (D.I. 37).  On August 7, 2020, the Court granted preliminary approval of the Settlement (D.I. 40) (the "Preliminary Approval Order").  Pursuant to the Preliminary Approval Order, on August 17, 2020, Lannett issued a press release on PRNewswire, filed with the SEC the Notice and Stipulation as exhibits to a Form 8-K, and posted the Notice together with the Stipulation on the investor relations portion of Lannett's corporate website.  *See* Preliminary Approval Order, ¶4. The deadline for Lannett stockholders to object to the Settlement is September 23, 2020.  To date, there have been no stockholder objections to the Settlement.

III.     **THE SETTLEMENT IS FAIR, REASONABLE, AND ADEQUATE**

The touchstone for court approval of a derivative settlement is whether the proposed settlement is fair, reasonable, and adequate and in the best interests of the corporation and its stockholders. *Bell Atlantic Corp. v. Bolger*, 2 F.3d 1304, 1310 (3d Cir. 1993). Courts in the Third Circuit rely upon the factors set forth in *Girsh v. Jepson*, 521 F.2d 153 (3d. Cir. 1975) to determine whether a proposed settlement is fair, reasonable, and adequate. *In re Johnson & Johnson Deriv. Litig.*, 900 F. Supp. 2d 467, 479 (D.N.J. 2012). Those factors include: (1) the benefit achieved through the settlement; (2) "'the complexity, expense, and likely duration of the litigation'"; (3) "'the reaction of the [stockholders] to the settlement'"[3]; (4) "'the stage of the proceedings and . . . discovery'"; (5) "'the risks of establishing liability'"; (6) "'the risks of establishing damages'"; (7) "'the range of reasonableness of the settlement [agreement] in light of the best possible recovery'"; and (8) "'the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation[.]'" *Girsh*, 521 F.2d at 157; *Shlensky v. Dorsey*, 574 F.2d 131, 147 (3d. Cir. 1978). A review of the *Girsh* factors makes clear that the Settlement is fair, reasonable, adequate, and will confer substantial benefit upon Lannett and its stockholders.

A.     **The Benefits Achieved Through the Settlement**

Corporate governance reforms that "serve to prevent and protect [the company] from the reoccurrence of certain alleged wrongdoings" confer a substantial benefit on the corporation and its stockholders. *See Unite Nat'l Ret. Fund v. Watts*, No. Civ. A. 04CV3603, 2005 WL 2877899, at *5 (D.N.J. Oct. 28, 2005); *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 395-96 (1970) ("a corporation may receive a substantial benefit from . . . private stockholders' actions of this sort

---

[3]     As noted above, no objections have been made by any Lannett stockholder as of the date of this filing.

involv[ing] corporate therapeutics, . . . [which] furnish a benefit to all shareholders").[4]  Here, the Settlement significantly benefits Lannett by requiring it to implement and maintain important corporate governance reforms specifically designed to prevent the alleged misconduct at issue in the case going forward.

### 1.    New and/or Newly Robust Corporate Policies

The Settlement requires Lannett to create and implement a number of new and/or revised corporate policies that directly address many of the concerns brought by Plaintiffs in the Derivative Action.  Chief among these are new and/or revised corporate policies regarding (1) conflicts of interest; (2) anti-corruption; (3) anti-bribery; and (4) gifts and entertainment.  In addition, since the initiation of the Derivative Action, Lannett has moved to bolster additional existing corporate policies, including amendments to its Antitrust Compliance Policy, effective August 1, 2019, and amendments to its Insider Trading Policy, effective June 28, 2019.  To ensure awareness of and compliance with these new corporate governing documents, Lannett has or will implement training specific to each one of these policies.  The creation and/or enhancement of these major corporate policies is crucial for Lannett to set a strong tone of compliance at the top of the organization.

### 2.    New Independent Director and Improved Board Training

After the filing of the Derivative Action, Lannett appointed a new independent Board member (as defined by the rules of the NYSE) as of July 1, 2019.  The new director will add an independent and diverse perspective to the Board that can ensure someone will speak up to prevent wrongdoing and provide insights and ideas that will benefit the Company.  In addition, all directors will receive ongoing, annual training on compliance issues, thus ensuring uniform and up-to-date

---

[4]        Unless otherwise noted all internal citations and quotation marks are omitted.

familiarity by the entire Board with Lannett's core compliance issues.  Lannett held the first of these director trainings on October 24, 2019.

### 3.    Enhanced Audit Committee Charter

In addition to newly implemented annual training on compliance issues for directors, Lannett will revise its Audit Committee Charter to include oversight of the Company's risks.  For the first time, the Audit Committee charter will require the Chief Compliance Officer to make an annual report on these risks to the Audit Committee.  Lannett also implemented additional relevant revisions to the Audit Committee Charter in October 2019.  These charter reforms will work to ensure a direct reporting line from the Company's compliance officers to the Board, and signal to the investing public that the Board takes compliance issues seriously.

### 4.    Employee Compliance and Whistleblower Policy

The Settlement requires Lannett to initiate employee compliance surveys, which is a new initiative for the Company.  In addition, Lannett has, since the initiation of the Derivative Action, implemented a revised and updated Whistleblower Policy as of June 15, 2019, and related training.  These reforms work to embed the compliance function throughout Lannett by informing, encouraging, and empowering each stakeholder of the Company to take and discharge the responsibility to keep the Company in substantial compliance.

Taken collectively, these are important Reforms that will dramatically improve the Company's corporate governance and oversight framework and will provide a substantial benefit to Lannett and its stockholders going forward.  The Reforms are fully set forth in Exhibit A to the Stip.

### B.    The Risks of Establishing Liability and Damages

In analyzing the Settlement, the Court must balance the risks of continued litigation with the benefits afforded to Lannett and the immediacy and certainty of a beneficial recovery. *See*

9

*Unite Nat'l Ret. Fund,* 2005 WL 2877899, at *4 ("The settlement provides immediate and substantial benefits for all parties and represents a better option than little or no recovery at all."). Even if this complex action were to reach trial, there is "no guarantee whom the jury would believe," which means that Plaintiffs would risk not prevailing on their claims. *See In re Cendant Corp. Litig.,* 264 F.3d 201, 239 (3d Cir. 2001). Here, the Settlement represents a better option than little or no recovery at all.

Plaintiffs faced numerous obstacles and uncertainties in litigating the Derivative Action. Defendants have denied, and continue to deny, that the claims advanced in the Derivative Action are meritorious, and they have denied, and continue to deny, all charges of wrongdoing or liability against them arising out of or relating in any way to the events, conduct, statements, acts, or omissions alleged or that could have been alleged in the Action. Defendants already filed motions to dismiss the Derivative Action, arguing, among other things, that: (i) Plaintiffs' claims for breach of the duty of loyalty fail because Plaintiffs failed to adequately allege demand futility with particularity; and (ii) certain of Plaintiffs' claims were, at most, claims that the Defendants breached their duty of care, claims for which Lannett's directors are exculpated by a provision in Lannett's certificate of incorporation. *See* D.I. 20, 21, 24.

Stockholder derivative plaintiffs face some of the most difficult pleading standards in the law. Delaware's requirement that a stockholder plead with particularity facts demonstrating the futility of making a pre-suit demand on the board of directors is satisfied only under "extraordinary conditions." *Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 96 (1991). Here, Plaintiffs used the tools at hand and Plaintiff Conrad had access to the internal documents obtained through the Conrad Demand. However, based on their experience in prosecuting stockholder derivative actions, Plaintiffs' Counsel acknowledge that even with the benefit of those internal corporate documents,

it was not certain that Plaintiffs had met the particularity standard mandated under Delaware law to establish demand futility.  If Plaintiffs cleared those pleading hurdles, significant questions would still remain about whether they could secure evidence sufficient to overcome motions for summary judgment predicated on the business judgment rule,[5] and the exculpation and indemnification rights Lannett grants its directors, absent a demonstration of intentional misconduct or disloyalty.  *In re Lear Corp. S'holder Litig*., 967 A.2d 640, 647-48 (Del. Ch. 2008) (where corporation adopts §102(b)(7) exculpation, plaintiff must plead non-exculpable claim that director breached duty of loyalty).

Even if Plaintiffs were to prevail on the motions to dismiss and for summary judgment, the amount of recoverable damages would still pose significant issues and would likely be subject to further litigation.  The amount of damages would be sharply disputed, and it is impossible to predict which arguments on damages would find favor with the trier of fact.  There is no guarantee the jury would accept Plaintiffs' experts' opinions and disregard Defendants' experts' opinions.[6] The damage assessment of experts on both sides would surely vary substantially, and the amount of damages could be reduced at trial to a "battle of the experts."  Furthermore, even if Plaintiffs were able to achieve a verdict in Lannett's favor, there is no guarantee that such verdict would survive a likely subsequent appeal.  *See Berkey Photo, Inc. v. Eastman Kodak Co*., 603 F.2d 263 (2d Cir. 1979) (reversing $87 million judgment after trial).

---

[5]     The business judgment rule affords directors a strong presumption that they acted on an informed basis, in good faith, and with the honest belief that they acted in the best interests of the corporation.  *See In re Walt Disney Co. Derivative Litig*., 907 A.2d 693, 746-47 (Del. Ch. 2005), *aff'd*, 906 A.2d 27 (Del. 2006).

[6]     *See In re Lloyd's Am. Tr. Fund Litig*., No. 96 Civ. 1262, 2002 WL 31663577, at *21 (S.D.N.Y. Nov. 26, 2002) ("The determination of damages . . . is a complicated and uncertain process, typically involving conflicting expert opinions.  The reaction of a jury to such complex expert testimony is highly unpredictable."), *aff'd sub nom, Adams v. Rose*, No. 03-7011, 2003 WL 21982207 (2d Cir. Aug. 20, 2003).

In sum, the Settlement agreed upon by the Parties ensures immediate benefits to the Company without the risk of expensive protracted litigation and possibility of no ultimate benefit to the Company. The substantial risks faced by Plaintiffs in establishing both liability and damages weigh in favor of approval. *In re Warfarin Sodium Antitrust Litig*., 391 F.3d 516, 537 (3d Cir. 2004) ("After evaluating several possible bars to plaintiffs' success at trial, the District Court concluded that on balance, the [risks of establishing liability and damages] favored settlement.").

### C.    The Complexity, Expense, and Likely Duration of Continued Litigation

Another factor weighing in favor of the Settlement is the complexity, expense, and likely duration of the litigation. *Girsh*, 521 F.2d at 157. Courts have consistently held that unless the proposed settlement is clearly inadequate, its acceptance and approval are preferable to the continuation of lengthy and expensive litigation with uncertain results. *See TBK Partners, Ltd v. W. Union Corp*., 675 F.2d 456, 462-63 (2d Cir. 1982). Here, as discussed above, Plaintiffs faced a significant risk that the case could get dismissed for failing to make a pre-suit demand. Moreover, even if Plaintiffs prevailed, the litigation of the Derivative Action would likely continue for several more years, as the Parties litigated motions to dismiss and for summary judgment, engaged in protracted discovery, and prepared for trial. Plaintiffs submit that the likely prospect of continued expensive, disruptive, and uncertain litigation favors approval of the proposed Settlement. *See Vinh Du v. Blackford*, C.A. No. 17-CV-194, 2018 WL 6604484, at *6 (D. Del. Dec. 17, 2018) ("It would have been expensive to bring to trial and would not have provided significant additional relief. . . . Continued litigation would have also required significant and costly expert discovery. Summary judgment motions have not yet been filed and, thus, the litigation would have continued for a substantial period of time. This factor weighs in favor of settlement.").

12

**D.     The Stage of the Proceedings and Discovery**

The stage of the proceedings and amount of discovery completed is another factor the Court may consider in determining the fairness, reasonableness, and adequacy of the proposed Settlement. *Girsh*, 521 F.2d at 157. Formal discovery, however, need not have been conducted if parties have sufficient information to make an informed decision about a settlement. *See Johnson & Johnson*, 900 F. Supp. 2d at 482-83 ("Even settlements reached at a very early stage and prior to formal discovery are appropriate where there is no evidence of collusion and the settlement represents substantial concessions by both parties."). The Settlement here was the product of extensive arm's length negotiations by experienced counsel. Plaintiffs also effectively obtained discovery through Plaintiff Conrad's effort to obtain documents pursuant to the Conrad Demand. Lannett produced responsive documents to Plaintiff Conrad, which were reviewed and evaluated. In addition, prior to and after filing the complaints in the Derivative Action, Plaintiffs conducted thorough investigations of the facts and legal sufficiency of the claims alleged in the Derivative Action. *See* Stip., §II; *Unite Nat'l Ret. Fund,* 2005 WL 2877899, at *3 ("[T]he parties fully appreciated the merits of this case.").

Plaintiffs and Plaintiffs' Counsel believe that the Settlement is fair, reasonable, adequate, and in the Company's best interest. Plaintiffs' Counsel thoroughly investigated the claims and reviewed internal Lannett corporate books and records and other documents. *See* Stip., §II. Plaintiffs' Counsel's opinion is thus well informed and this factor, like the preceding factors discussed above, supports approval of the Settlement. *See Neponsit Inv. Co. v. Abramson*, 405 A.2d 97, 99-100 (Del. 1979) (approving settlement based, in part, on plaintiff's counsel's conclusion that the settlement was fair and in the best interest of the class).[7] The independent

---

[7]     Courts also look to the opinion of experienced counsel in assessing the fairness of a settlement. *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 125 (S.D.N.Y. 1997) ("[G]reat

directors of the Board have also approved the Settlement and each of its terms, as in the best interest of Lannett.  Stip., §I.

## IV.   THE AGREED-UPON FEE AND EXPENSE AWARD IS REASONABLE AND SHOULD BE APPROVED

After the Parties negotiated the substantive terms of the Settlement, they began negotiating, with the substantial assistance of the Mediator, Mr. Lindstrom, the amount of attorneys' fees and expenses to be paid to Plaintiffs' Counsel in recognition of the substantial benefits achieved. Subject to Court approval, Defendants have agreed to pay an aggregate amount of $600,000 to Plaintiffs' Counsel.  *See* Stip., §IV, ¶5.1.  For the reasons discussed below, Plaintiffs submit that the agreed-upon Fee and Expense Award is fair and reasonable and should be approved.[8]

### A.   Applicable Legal Standards

Numerous courts have recognized that it is appropriate to award attorneys' fees and expenses where plaintiff's counsel's efforts have conferred a corporate benefit upon the company and its stockholders.  *Mills,* 396 U.S. at 391-92.[9]  There is "no set method or fixed formula to

---

weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation.").  Plaintiffs' Counsel are experienced and skilled in stockholder derivative litigation.  *See* Johnson Decl., Ex. A; Brown Decl., Ex. A; Kim Decl., Ex. A.  Plaintiffs' Counsel have seen many dozens of stockholder derivative actions to successful conclusions and its lawyers have widespread recognition in the field of stockholder rights litigation.  *Id.*  Lannett and Defendants are represented by several eminent law firms, including Kirkland & Ellis LLP, Fox Rothschild LLP, Jenner and Block LLP, and Ross Aronstam & Moritz LLP, each of which has substantial skills and experience representing defendants in complex corporate litigation.

[8]      The U.S. Supreme Court has endorsed this type of consensual resolution of attorneys' fees issue as the ideal toward which litigants should strive.  *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983) ("A request for attorney's fees should not result in a second major litigation.  Ideally, of course, litigants will settle the amount of a fee.").

[9]      Plaintiffs' fee request is governed by federal law, as to the federal question claims, and Delaware law, as to the supplemental jurisdiction state law claims.  *Barton v. Clancy*, 632 F.3d 9, 17 (1st Cir. 2011) (a "federal court . . . exercising supplemental jurisdiction over a state law claim must apply state substantive law") (citing *Hoyos v. Telecorp Commc'ns, Inc.*, 488 F.3d 1, 5 (1st Cir. 2007)).  In any event, there is no meaningful difference between Delaware and federal law

assess an application for attorneys['] fees" and courts are directed to "examine the totality of circumstances." *In re Golden State Bancorp Inc. S'holders Litig.*, No. Civ. A. 16175, 2000 WL 62964, at \*3 (Del. Ch. Jan. 7, 2000). Courts typically consider the value of the benefits achieved, efforts of counsel, difficulty of the litigation, contingent nature of the fee, and counsel's skill, standing, and ability. *See id.*; *Cohn v. Nelson*, 375 F. Supp. 2d 844 (E.D. Mo. 2005); *In re Dr. Pepper/Seven Up Cos., S'holders Litig.*, C.A. No. 13109, 1996 WL 74214, at \*4 (Del. Ch. Feb. 9, 1996) (citing *Sugarland Indus., Inc. v. Thomas*, 420 A.2d 142 (Del. 1980)).  A court may also consider fee awards in comparable cases involving similar benefits in determining a reasonable fee. *Dow Jones & Co. v. Shields*, No. 184,1991, 1992 WL 44907, at \*3 (Del. Ch. Jan. 10, 1992) (reviewing similar fee awards and concluding the award was not excessive by comparison).

The Third Circuit has held that "the extent of the benefit to be derived from the proposed settlement by the corporation" is the primary factor to consider when analyzing the reasonableness of attorney's fees in a derivative action.  *See Shlensky*, 574 F.2d at 147.

### B.    The Settlement Confers Substantial Benefits on Lannett

Delaware courts also give the benefits achieved by the litigation the most weight in determining a fee award. *Sugarland*, 420 A.2d at 149-50; *Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del. 2012); *In re AXA Fin., Inc. S'holders Litig.*, No. 18268, 2002 WL 1283674, at \*7 (Del. Ch. May 22, 2002) ("[T]his court has recognized in the past that the hourly rate represented by a fee award is a secondary consideration, the first issue being the size of the benefit created.").  As detailed above, the Settlement significantly benefits Lannett by requiring it to implement important

---

when it comes to determining reasonable attorneys' fees in derivative litigation. *In re Oracle Secs. Litig.*, 852 F. Supp. 1437, 1445 (N.D. Cal. 1994).

corporate governance reforms that are specifically designed to prevent the recurrence of Defendants' alleged misconduct.

Corporate governance reforms, like those achieved here, unquestionably bring valuable benefits to corporations, such as Lannett, and justify approval of Plaintiffs' requested fees and expenses award. *See, e.g., San Antonio Fire & Police Pension Fund v. Bradbury*, C.A. No. 4446, 2010 WL 4273171, at *13 (Del. Ch. Oct. 28, 2010) (noting that "[a]lthough the Court cannot calculate the benefit achieved as a precise number, that does not detract from the significance of the non-monetary relief produced by [plaintiff]'s efforts[,]" and that the corporate governance reform "may be recognized as having a very real, even if unquantifiable, benefit"); *Ryan v. Gifford*, No. 2213-CC, 2009 WL 18143, at *10 (Del. Ch. Jan. 2, 2009) (recognizing that "governance reforms can provide substantial benefits and are appropriately considered by the Court when evaluating a proposed settlement"). The Parties agree that the Reforms confer a substantial benefit to Lannett and its stockholders. *See* Stip., §§II, III.

### 1. The Agreed-Upon Fee and Expense Award is in Line with (or Less than) Fee and Expense Awards in Comparable Cases

The agreed-upon Fee and Expense Award should also be approved because it compares very favorably with fees awarded in other recent derivative cases that resulted in benefits similar to, or even less than, those achieved for Lannett here. The Third Circuit and courts around the country have consistently placed a significant value upon non-monetary benefits obtained in cases like the Derivative Action, involving complex corporate governance issues. *See, e.g.*, *Merola v. Atlantic Richfield Co.*, 515 F.2d 1 65, 169-70 (3d Cir. 1975) (holding that awarding appropriate attorneys' fees was justified when a substantial non-monetary benefit was conferred upon a corporation). For example, in *In re TerraForm Power, Inc. Deriv. Litig.*, the Court approved a $3 million fee award in connection with a settlement where a main benefit, among others, was the

addition of a new independent board member, as well as increasing officer and operating independence from the company's controller. No. 11898-CB, Transcript (Del. Ch. Dec. 19, 2016; Dec. 30, 2016). There, the Court noted that the addition of an independent director is a "meaningful benefit" and "is relief that would have been difficult for the Court to judicially order and certainly is a good thing." *Id*. at 20-21. Similarly, in *Rubery v. Kleinfeld*, No. 2:12-cv-00844, ECF No. 53 (W.D. Pa. Jan. 20, 2015), the Court approved a $3.75 million fee award in connection with a settlement that created new ethics and compliance officer positions and enhanced anti-corruption policies. Here, the Settlement goes even further than those cases given the full package of compliance enhancements, along with a new independent director.

These are just some examples of numerous cases where courts have recognized the significant value of the addition of new independent directors and other corporate governance reforms. *See also In re OSI Sys., Inc. Derivative Litig*., No. CV-14-2910, 2017 WL 5642304 (C.D. Cal. May 2, 2017) (approving a $1.6 million fee award for the addition of a new independent director and other governance reforms, including revisions to committee charters and the company's insider trading policy); *Cty. of York* (approving $4 million fee award in connection with a settlement enhancing board and management compliance and reporting functions and imposing policies to punish employees for misconduct); *In re Hewlett-Packard Co. S'holder Derivative Litig.*, No. C-12-6003, 2015 WL 4605786, at *5 (N.D. Cal. July 30, 2015). (approving $4.6 million fee award in connection with a settlement that included greater board involvement and oversight of merger and acquisition process); *In re Davita Healthcare Partners, Inc.*, No. 12-CV-2074, 2015 WL 3582265, at **3,5 (D. Colo. June 5, 2015) (approving $6.2 million fee award in connection with settlement that enhanced board and committee independence, oversight, and power and the company's compliance program).

**C.      The Efforts of Plaintiffs' Counsel and the Standing and Ability of Counsel**

While the benefit brought by a settlement is the primary factor courts look to in awarding attorneys' fees, the time and effort of counsel can serve as a cross-check on the reasonableness of a fee award. *In re Sauer-Danfoss Inc. S'holders Litig*., 65 A.3d 1116, 1138 (Del. Ch. 2011); *In re Del Monte Foods Co. S'holders Litig*., C.A. No. 6027, 2011 WL 2535256, at *12 (Del. Ch. June 27, 2011).

Here, Plaintiffs' Counsel's efforts included, among other things: (1) reviewing publicly available information, including filings by Lannett with the SEC, press releases, news reports, analyst reports, investor conference transcripts, court opinions, and other matters of public record; (2) reviewing non-public, internal Company information, including documents obtained pursuant to the Conrad Demand for inspection of the Company's books and records; (3) researching the applicable law with respect to the claims alleged in the Derivative Action and potential defenses thereto; (4) preparing and filing the complaints in the *Dozier* and *Conrad* Actions; (5) participating in informal conferences with Defendants' counsel; (6) researching corporate governance issues; (7) drafting a settlement demand and comprehensive mediation statement; (8) participating in an in-person mediation and negotiating the Settlement with Defendants; (9) reviewing the allegations in related governmental and securities class action matters; and (10) drafting the final Settlement agreement and motions for preliminary and final approval of the Settlement. *See* Stip., §II.

In total, Plaintiffs' Counsel expended 1,160.34 hours in attorney and professional staff time prosecuting this Derivative Action through September 16, 2020, incurred $901,922.50 in total lodestar, and incurred $28,270.17 in necessary litigation expenses. Johnson Decl. ¶4; Brown Decl. ¶7; Kim Decl. ¶6; Farnan Decl. ¶5. The requested fee is approximately .63 times the overall lodestar for this time period and an average hourly rate of approximately $492.73. This requested fee and expense award compares very favorably with multipliers and hourly rates approved in

similar cases.  *See, e.g., Abercrombie & Fitch*, 886 A.2d at 1273 (affirming fee award equal to 2.39 times lodestar, which the court characterized as "'well within the range of reasonableness for this kind of litigation'");  *AXA Fin.*, 2002 WL 1283674, at *7 (fee award "represent[ed] an hourly rate of more than $2,630").

Plaintiffs' Counsel provided high-quality services to Lannett's stockholders, reflecting the qualifications, experience, and dedication of their lawyers and professional staff.  *See In re Caremark Int'l Inc. Derivative Litig.*, 698 A.2d 959, 972 (Del. Ch. 1996) (noting that "[t]he services rendered required a high degree of sophistication and expertise").  In addition, in considering a fee award, the Court must consider "[t]he standing and ability of Plaintiff's Counsel."  *San Antonio Fire*, 2010 WL 4273171, at *13.  Here, Plaintiffs' Counsel are well respected defenders of stockholder rights with significant track records of success.  *See* Johnson Decl., Ex. A; Brown Decl., Ex. A; Kim Decl., Ex. A.  Plaintiffs' Counsel have brought dozens of derivative actions to successful conclusions and its lawyers have earned recognition in the field of stockholder rights litigation.  *Id.*  In addition, the quality of opposing counsel sets in higher relief the significance of the results that Plaintiffs' Counsel were able to achieve and further supports Plaintiffs' Counsel's request for attorney fees and expenses.

### D.     The Contingent Nature of the Fee Supports the Requested Fee Award

Courts also recognize that counsel is typically "entitled to a much larger fee when the compensation is contingent than when it is fixed on an hourly or contractual basis."  *Ryan*, 2009 WL 18143, at *13.  Here, Plaintiffs' Counsel litigated this Derivative Action on a fully contingent basis knowing that they would likely entail hundreds of hours of firm time and hundreds of thousands of dollars in upfront costs that might not be recouped for years, if ever.  Stockholder derivative litigation involves significant contingency risks.  *In re Pacific Enters. Secs. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (noting that "the odds of winning [a] derivative lawsuit [are]

extremely small").  Therefore, public policy supports "reward[ing] this sort of risk taking in determining the amount of a fee award."  *In re First Interstate Bancorp Consol. S'holder Litig*., 756 A.2d 353, 365 (Del. Ch. 1999).  Where benefits from a settlement are nonmonetary, courts typically "add[] a premium to the plaintiffs' attorneys['] typical noncontingency fee in proportion to the benefit the plaintiffs' attorneys achieved for their clients."  *Golden State*, 2000 WL 62964, at *3.[10]

### E.    The Plaintiffs' Service Award Should Be Approved

Finally, Plaintiffs seek service awards of $1,500 payable to each Plaintiff out of Plaintiffs' Counsel's Fee and Expense Award.  *See In re Cendant Corp., Derivative Action Litig*., 232 F. Supp. 2d 327, 344 (D.N.J. 2002) (noting service awards "reward the public service performed by lead plaintiffs.").

During the litigation, Plaintiffs participated meaningfully, including by carefully reviewing the initial Section 220 request (Plaintiff Conrad), settlement demand, mediation statements, Stipulation, complaints, and briefing and participated in, and were kept apprised of, other developments in the investigation and lawsuit.  Courts regularly approve similar service awards for plaintiffs who actively participate in the litigation process.  *See, e.g., Ryan*, 2009 WL 18143, at *14 (awarding $5,000 to each plaintiff); *see Nitsche v. Temple*, No. 12636-VCG (Del. Ch. May 26, 2017) (awarding to $5,000 to plaintiff "in consideration of his participation in this Action as a derivative representative").

---

[10]    *See, e.g., id.* (awarding a 25% risk premium despite a "modest benefit"); *In re Plains Res. Inc. S'holders Litig*., No. Civ. A. 071-N, 2005 WL 332811, at *6 (Del. Ch. Feb. 4, 2005) (awarding fee representing "roughly $1,165 per hour . . . a 150% premium over the blended rates of plaintiffs' counsel").

DATED:  September 16, 2020

**FARNAN LLP**

 _/s/ Brian E. Farnan_
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Liaison Counsel for Plaintiffs*

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Geoffrey M. Johnson
12434 Cedar Road, Suite 12
Cleveland Heights, OH 44106
Telephone: (216) 229-6088
Facsimile: (860) 537-4432
gjohnson@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
Scott R. Jacobsen
Jonathan M. Zimmerman
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
sjacobsen@scott-scott.com
jzimmerman@scott-scott.com

*Co-Lead Counsel for Plaintiffs*

**THE BROWN LAW FIRM, P.C.**
Timothy Brown
240 Townsend Square
Oyster Bay, NY 11771
Telephone: (516) 922-5427
Facsimile: (516) 344-6204
tbrown@thebrownlawfirm.net

**THE ROSEN LAW FIRM, P.A.**
Phillip Kim
275 Madison Avenue, 40th Floor
New York, NY 10016

Telephone: (212) 686-1060
Facsimile: (212) 202-3827
pkim@rosenlegal.com

*Co-Lead Counsel for Plaintif*